**No. 26-______**

**IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT**

BUCKS COUNTY EMPLOYEES RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated,

*Plaintiffs-Respondents*,

v.

NORFOLK SOUTHERN CORPORATION, JAMES A. SQUIRES, ALAN H. SHAW, and CYNTHIA M. SANBORN,

*Defendants-Petitioners.*

On Petition for Permission to Appeal from the United States District Court for the Northern District of Georgia In Case No: 1:23-cv-04175-SDG

# DEFENDANTS' PETITION FOR PERMISSION TO APPEAL PURSUANT TO FED. R. CIV. P. 23(f) FROM ORDER GRANTING CLASS CERTIFICATION

PETER J. KOLOVOS
SOFIE C. BROOKS
ELIZABETH J. BEDRICK
THERESE J. BROWN
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
peter.kolovos@wilmerhale.com
sofie.brooks@wilmerhale.com
liz.bedrick@wilmerhale.com
therese.brown@wilmerhale.com

MICHAEL G. BONGIORNO
TAMAR KAPLAN-MARANS
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
Fax: (212) 230-8888
michael.bongiorno@wilmerhale.com
tamar.kaplan-marans@wilmerhale.com

*Counsel for Defendants Norfolk Southern Corporation, James A. Squires, Alan H. Shaw, and Cynthia M. Sanborn*

October 13, 2026

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-2(b), Petitioners Norfolk Southern Corporation, James A. Squires, Alan H. Shaw, and Cynthia M. Sanborn hereby certify that upon information and belief, the following persons and entities have an interest in the outcome of this case or appeal, including subsidiaries, conglomerates, affiliates, parent corporations, any publicly held corporation that holds 10% or more of a party's stock, and other identifiable legal entities related to a party:

1. Adams, Hilary H. (Defendants' counsel)
2. Bedrick, Elizabeth J. (Defendants' counsel)
3. Bell, Julia (Defendants' counsel)
4. Bongiorno, Michael G. (Defendants' counsel)
5. Boring, Anne M. (Plaintiffs' counsel)
6. Brooks, Sofie C. (Defendants' counsel)
7. Brown, Therese J. (Defendants' counsel)
8. Bucks County Employees Retirement System (Plaintiff)
9. Caplan, Michael A. (Plaintiffs' counsel)
10. Caplan Cobb LLC (Plaintiffs' counsel)
11. Caringal, Jennifer (Plaintiffs' counsel)
12. Conover, Mark (Plaintiffs' counsel)
13. Davis, Jason C. (Plaintiffs' counsel)

14. Djilani, Jessica (Defendants' counsel)
15. Friedman, Daniel A. (Plaintiffs' counsel)
16. Garber, Alec S. (Plaintiffs' counsel)
17. General American Insurance Company (Defendant's subsidiary)
18. Gephart, Jack Abbey (Plaintiffs' counsel)
19. Grimberg, Hon. Steven D. (U.S. District Court Judge)
20. Hall, Bloch, Garland & Meyer, LLP (Defendants' counsel)
21. Hasiuk, Nathan A. (Plaintiffs' counsel)
22. Herman, John C. (Plaintiffs' counsel)
23. Herman Jones LLP (Plaintiffs' counsel)
24. Isaac Wiles & Burkholder, LLC (Plaintiffs' counsel)
25. Kaplan-Marans, Tamar (Defendants' counsel)
26. Keider, Jocelyn (Defendants' counsel)
27. Kessler Topaz Meltzer & Check LLP (Plaintiffs' counsel)
28. Ko, Peter (Plaintiffs' counsel)
29. Kolovos, Peter J. (Defendants' counsel)
30. Landes, Mark David (Plaintiffs' counsel)
31. Maciel, Sarah (Defendants' counsel)
32. Materese, Joshua A. (Plaintiffs' counsel)
33. Milan, Vanessa M. (Plaintiffs' counsel)
34. Murray, Joseph F. (Plaintiffs' counsel)
35. Murray Murphy Moul + Basil LLP (Plaintiffs' counsel)
36. Norfolk Southern Corporation (Defendant)

37. Norfolk Southern Properties, Inc. (Defendant's subsidiary)
38. Norfolk Southern Railway Company (Defendant's subsidiary)
39. NS Fiber Optics, Inc. (Defendant's subsidiary)
40. Price, Ashley M. (Plaintiffs' counsel)
41. Prizgintas, Albinas (Defendants' counsel)
42. Robbins Geller Rudman & Dowd LLP (Plaintiffs' counsel)
43. Roberts, Cameron B. (Plaintiffs' counsel)
44. Sanborn, Cynthia M. (Defendant)
45. Shaw, Alan H. (Defendant)
46. Shelton-Benson, Ryan (Plaintiffs' counsel)
47. Shiarella, Ripley (Defendants' counsel)
48. Squires, James A. (Defendant)
49. T-Cubed of North America, LLC (Defendant's subsidiary)
50. Thoroughbred Technology and Telecommunications, LLC (Defendant's subsidiary)
51. White, Thomas (Defendants' counsel)
52. Wilmer Cutler Pickering Hale and Dorr LLP (Defendants' counsel)

Date: October 13, 2026

*/s/Michael G. Bongiorno*
Michael G. Bongiorno

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES .......... ii

INTRODUCTION .......... 1

BACKGROUND .......... 4

QUESTIONS PRESENTED .......... 9

REASONS FOR GRANTING THE PETITION .......... 9

I. THE PETITION PRESENTS AN UNSETTLED AND IMPORTANT QUESTION ABOUT HOW TO ASSESS PRICE IMPACT AFTER *GOLDMAN I* .......... 9

II. THE OTHER *PRADO-STEIMAN* FACTORS WEIGH IN FAVOR OF GRANTING THE PETITION .......... 16

A. The District Court Made Profound Errors of Law .......... 16

B. The Court Should Not Delay Review .......... 22

CONCLUSION .......... 23

CERTIFICATE OF COMPLIANCE

ADDENDUM

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

## CASES

Page(s)

*Arkansas Teacher Retirement System v. Goldman Sachs Group*,
77 F.4th 74 (2d Cir. 2023) ....................................................11, 12, 15

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)........................................................................7

*BP P.L.C. v. Mayor & City Council of Baltimore*,
593 U.S. 230 (2021).......................................................................17

*Carpenters Pension Trust Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) .......................................................10

*In re Concho Resources, Inc.*,
2025 WL 1040379 (S.D. Tex. Apr. 7, 2025).....................................13

*Ferris v. Wynn Resorts Ltd.*,
2023 WL 2337364 (D. Nev. Mar. 1, 2023) .......................................13

*In re FibroGen Securities Litigation*,
2024 WL 1064665 (N.D. Cal. Mar. 11, 2024) ..................................14

*FindWhat Investor Group v. FindWhat.com*,
658 F.3d 1282 (11th Cir. 2011) ...................................................18, 19

*In re FirstEnergy Corporation Securities Litigation*,
149 F.4th 587 (6th Cir. 2025) ......................................................12, 15

*Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*,
594 U.S. 113 (2021)...................................................................*passim*

*Jaeger v. Zillow Group, Inc.*,
2025 WL 2741642 (9th Cir. Sep. 26, 2025) ...................................12, 13, 14, 19

*MacPhee v. MiMedx Group, Inc.*,
73 F.4th 1220 (11th Cir. 2023).....................................................19, 20

*Meyer v. Greene*,
710 F.3d 1189 (11th Cir. 2013) ...............................................8, 19, 20

*In re Norfolk Southern Corporation Bond/Note Securities Litigation*,
2026 WL 555420 (2d Cir. Feb. 27, 2026) ........................................................21

*Ocwen Loan Servicing LLC v. Belcher*,
2018 WL 3198552 (11th Cir. June 29, 2018)...................................................23

*Prado-Steiman ex rel. Prado v. Bush*,
221 F.3d 1266 (11th Cir. 2000) ...................................................................*passim*

*In re Qualcomm Inc. Securities Litigation*,
2023 WL 2583306 (S.D. Cal. Mar. 20, 2023) ..................................................13

*San Diego County Employees Retirement Association v. Johnson & Johnson*,
2025 WL 2176586 (3d Cir. July 30, 2025).................................................12, 15

*Shupe v. Rocket Companies*,
752 F. Supp. 3d 735 (E.D. Mich. 2024) ...........................................................13

*Strougo v. Barclays PLC*,
312 F.R.D. 307 (S.D.N.Y. 2016).......................................................................10

*United States v. Deleveaux*,
205 F.3d 1292 (11th Cir. 2000) .......................................................................18

*West v. Prudential Securities, Inc.*,
282 F.3d 935 (7th Cir. 2002) .......................................................................4, 15

## DOCKETED CASES

*Acuity Brands, Inc. v. Public Employees' Retirement System of Mississippi*,
No. 20-90018 (11th Cir.) ..................................................................................15

*DAL v. Siegel*,
No. 16-90013 (11th Cir.) ..................................................................................16

*In re FirstEnergy Corporation Securities Litigation*,
No. 26-0303 (6th Cir.) ................................................................................16, 17

*Jaeger v. Zillow Group, Inc.*,
No. 24-5473 (9th Cir.) ......................................................................................15

## FEDERAL RULES AND LEGISLATIVE MATERIALS

Fed. R. Civ. P. 23(b) ..........................................................................................7

Fed. R. Civ. P. 23(f) .......... 9, 15, 23

H.R. Rep. No. 104-369 (1995) .......... 3

## OTHER AUTHORITIES

Ebersole, Joshua T., et al., *The (Mis)Matching Game: Price Impact Challenges to Class Certification Five Years After Goldman*, 36 Class Actions & Derivative Suits 12 (2026) .......... 11, 13

Perino, Michael A., *Private Securities Enforcement and the Roberts Court*, 99 St. John's L. Rev. 737 (2026) .......... 11

Reed, Noelle & Morrison, Peter, *Goldman Ruling Is a Boon for Class Action Defendants*, Law360 (June 21, 2021) .......... 11

Saltzstein, Susan, et al., *Securities Class Cert., 5 Years After Goldman Ruling*, Law360 (June 22, 2026) .......... 13

Turk, Matthew C., *The Securities Fraud Class Action After Goldman Sachs*, 59 Am. Bus. L.J. 281 (2022) .......... 10

## INTRODUCTION

The district court failed to apply correctly Supreme Court precedent governing class certification in a securities case, warranting this Court's intervention and immediate vacatur of the class certification order. Five years ago, the Supreme Court held that where there is a mismatch between generic alleged false or misleading statements and a specific corrective disclosure, a court cannot reasonably infer that alleged misstatements impacted the stock price. *See Goldman Sachs Grp., Inc. v. Arkansas Teacher Ret. Sys.*, 594 U.S. 113, 122-23 (2021) ("*Goldman I*"). Since *Goldman I*, lower courts have fractured in trying to isolate when this mismatch in specificity exists. Plaintiffs allege that a series of Norfolk Southern's generic statements about safety were shown to be false or misleading by far more specific events, including a train derailment and government and press commentary about that derailment. In its order finding no mismatch between these alleged corrective disclosures and certain "operational" safety statements, the district court noted the lack of "in-Circuit guidance" about evaluating price impact in this situation, ECF 238 ("Op.") 40, and openly questioned how it should conduct the very analysis on which its decision turned, Op.45. That uncertainty led to multiple legal errors. Among other things, the court deferred questions that *Goldman I* requires courts to resolve at class certification and held Defendants to a higher burden than *Goldman I* imposes. Because certified securities class actions almost always settle before

reaching final judgment, these errors will compound in future decisions unless the Court grants review now.

Like this case, *Goldman I* was an "inflation-maintenance" securities class action, meaning that the only alleged evidence of price impact was that the stock price dropped after a highly publicized disclosure. In *Goldman I*, that disclosure was the announcement of a government enforcement action regarding the bank's conflict of interest in a particular transaction. Here, the alleged corrective disclosures for Norfolk Southern's safety statements included, among other things, a train derailment in East Palestine, Ohio in 2023 (the "Derailment"), two minor, unrelated derailments, and news articles and statements by government officials about the impacts of the Derailment. In both cases, plaintiffs' theories rest on the assumption that the alleged false or misleading statements "maintained" the price of the stock continuously, which allowed them to avoid having to show that the stock price increased due to the alleged misstatements. *Goldman I* held that, where there is a "mismatch" between generic statements and a more specific corrective disclosure, it is error to assume that a stock price drop following the disclosure means the challenged statements previously impacted price. This is particularly true in inflation-maintenance cases where there is no direct evidence that the alleged misstatements caused the stock price to increase. The Supreme Court reasoned that a mismatch makes it "less likely that the specific disclosure actually corrected the

generic misrepresentation, which means that there is less reason to infer front-end price inflation—that is, price impact—from the back-end price drop." 594 U.S. at 123.

*Goldman I* was intended to guide lower courts' class certification analyses in securities cases, with an eye towards curbing opportunistic litigation brought after a discrete event—here the train derailment and its aftermath—that causes an issuer's stock price to drop. Securities plaintiffs regularly file "event-driven" lawsuits in which they characterize generalized corporate statements about safety, compliance, ethics, or the equivalent as securities fraud, which is exactly the problem that the Private Securities Litigation Reform Act ("PSLRA") was meant to address over 30 years ago. *See* H.R. Rep. No. 104-369 at 31 (1995) (PSLRA enacted in response to "the routine filing of lawsuits against issuers of securities and others whenever there is a significant change in an issuer's stock price," among other things).

But the Supreme Court in *Goldman I* remanded without articulating a test for assessing a mismatch in the price impact analysis. In the intervening years, four circuit courts have had occasion to speak on this issue—each time on interlocutory review. This Court has not addressed the question. In the absence of settled guidance, lower courts have adopted conflicting approaches and reached inconsistent results.

The decision below illustrates the problem: The district court required Defendants to refute price impact "entirely," Op.38, even though *Goldman I* requires only a showing by a preponderance, and it refused to consider all but the last of the alleged corrective disclosures, Op.36. It then concluded that several of Norfolk Southern's generic safety statements matched the specific disclosures closely enough to infer that the price drop removed the inflation those statements had maintained, and certified a class for all but three months of Plaintiffs' requested class period. That conclusion not only contravenes *Goldman I* but is also difficult to reconcile with the Second Circuit's affirmance of a ruling dismissing nearly identical statements earlier this year.

The Court should grant this petition to provide guidance because "very few securities class actions are litigated to conclusion, so review of this novel and important legal issue may be possible only through the Rule 23(f) device." *West v. Prudential Sec., Inc.*, 282 F.3d 935, 937 (7th Cir. 2002).

## BACKGROUND

On February 3, 2023, a Norfolk Southern-operated train derailed in East Palestine, Ohio. ¶ 277.[1] A fire ignited at the derailment site affecting several train cars, including five cars carrying vinyl chloride. ¶¶ 278, 288-90. An emergency

[1] Unless otherwise noted, all "¶" citations are to the Consolidated Complaint for Violations of the Federal Securities Laws (ECF No. 82).

response team, composed of the local fire chief, state and federal officials, and Norfolk Southern's emergency contractors, reported to the scene. ¶¶ 284, 287-88, 341-42. On February 6, after residents were ordered to evacuate, ¶ 446, and after consultation with emergency responders and Norfolk Southern, the fire chief directed Norfolk Southern to relieve the pressure from the vinyl chloride cars to avoid a catastrophic explosion, ¶¶ 341-43. Norfolk Southern's contractors conducted a controlled "vent and burn" of the vinyl chloride cars. ¶¶ 341-43, 356.

In the years before the Derailment, Norfolk Southern made a series of general statements about safety equivalent to those nearly every comparable railroad company makes. For instance, Norfolk Southern stated that it "delivered record productivity levels while providing safe and reliable freight solutions for [its] customers," ¶ 408; "[n]one of … safety, customer service, or returning value to shareholders … has to come at the expense of the others," ¶ 417; "the technology that[] [is] brought to us with distributed power capability[] makes [operations] very safe and effective," ¶ 431; and that it was "not going to cut corners on safety," ¶ 440. Alongside these generic statements, the Company also made detailed public disclosures about both the risk of derailments and its derailment data, including its reporting to the Federal Railroad Administration. Thus, informed investors bought Norfolk Southern stock knowing that derailments, even serious ones, are not uncommon in the rail industry.

Shortly after the Derailment, Norfolk Southern stockholders sued Norfolk Southern and certain of its former executives, asserting that thirty of Defendants' prior statements concerning the safety of Norfolk Southern's operations and five statements regarding the vent and burn were false or misleading. ¶¶ 407-19, 422, 424-25, 427, 429, 431, 433-34, 437-43, 446-47, 449-51, 453. They alleged that the Derailment and several events that followed, including a series of news articles about the impacts of the Derailment, regulator activity, statements by government officials, and two other minor derailments, revealed to investors that Norfolk Southern's operations were not safe. ¶¶ 508-52.

Plaintiffs' allegations center on Precision Scheduled Railroading ("PSR"), an operations model, aspects of which Norfolk Southern began to incorporate in 2019. PSR was widely adopted throughout the rail industry and is still the prevailing operations model among all major railroads.[2] As part of its version of PSR, Norfolk Southern announced a goal to reduce its operating ratio, a metric calculated by dividing operating expenses by operating revenues, to 60% by 2021. ¶¶ 75, 79-80. To achieve this, Norfolk Southern disclosed that it would reduce its workforce, run longer trains, and tighten capital expenditures, among other things. ¶¶ 80-81. PSR did not materially change accident rates. ECF 206-02 at 5 n.7 (Defendants' expert

---

[2] During the class period, five of the six major railroads employed principles of PSR. ¶ 73 & n.2.

citing 2022 GAO Report). Nevertheless, Plaintiffs seize upon these business practices, arguing that implementing the principles of PSR led to unsafe operations, contrary to Norfolk Southern's representations to investors about its commitment to safety.

The district court denied Defendants' motion to dismiss, and the case proceeded to discovery. Plaintiffs moved to certify a class of investors who purchased Norfolk Southern stock between October 28, 2020 and March 3, 2023, relying on the fraud-on-the-market presumption of reliance established in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). The *Basic* presumption satisfies a plaintiff's predominance burden under Rule 23(b) where "the market price of shares traded on well-developed markets reflects all publicly available information," such that an investor relies on public misstatements when the investor buys or sells stock at the price set by the market. *Id.* at 246-47. Defendants argued that, although the prerequisites for the presumption were met, the presumption was rebutted because the challenged statements had no "price impact." *See Goldman I*, 594 U.S. at 119, 122. Specifically, among other arguments, Defendants invoked *Goldman I*, arguing that the challenged statements were too generic to match the specificity of the purported back-end corrective disclosures.

The district court certified a class of shareholders who purchased or acquired Norfolk Southern common stock from January 27, 2021 through March 3, 2023.

Op.37-39, 58-59, 70. Although the court agreed that seventeen of the challenged safety statements were too generic to match the alleged corrective disclosures under *Goldman I*,[3] it held that thirteen "operational" safety statements—which are not meaningfully different from the seventeen statements it eliminated—were appropriately specific. It ultimately granted Plaintiffs' request to certify a class for a two-year period leading up to and immediately after the Derailment, shortening Plaintiffs' requested date range by only three months at the beginning of the class period.

The court's ruling rests on several misunderstandings about the relevant legal tests. First, the court improperly deferred to the merits phase questions that, under *Goldman I*, courts must resolve at class certification. Second, it failed to apply *Goldman I*'s direction to decide price impact under a preponderance standard. Third, the court failed to assess "whether *each* proffered corrective disclosure contained new information," and instead assessed only whether the *last* alleged corrective disclosure was new. *Meyer v. Greene*, 710 F.3d 1189, 1197 (11th Cir. 2013) (emphasis added). And fourth, the court allowed the "operational" statements to go forward on the ground that they are sufficiently specific, even though Plaintiffs do not allege the operational aspects were false.

[3] The court also held that five statements about the vent and burn could not proceed because Plaintiffs alleged no correction for these statements.

## QUESTIONS PRESENTED

1. How courts should assess price impact at class certification in inflation-maintenance cases under *Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 594 U.S. 113 (2021).

2. Whether the court erred by rejecting *Goldman I*'s holdings as to the need to consider all relevant evidence and the legal standard for price impact, by refusing to consider whether all but one alleged corrective disclosure provided new information to the market, and by arbitrarily holding that the "operational" statements were specific based on representations not alleged to be false.

## REASONS FOR GRANTING THE PETITION

### I. THE PETITION PRESENTS AN UNSETTLED AND IMPORTANT QUESTION ABOUT HOW TO ASSESS PRICE IMPACT AFTER *GOLDMAN I*

The class certification order presents an important and unsettled question regarding how to assess price impact in inflation-maintenance securities class actions. Courts widely recognize that Rule 23(f) review is appropriate where a petition raises an "important, unsettled legal question[]" whose resolution will materially assist the development of the law and is unlikely to receive effective review after final judgment. *Prado-Steiman ex rel. Prado v. Bush*, 221 F.3d 1266, 1272, 1275 (11th Cir. 2000). How courts should evaluate an alleged mismatch between a challenged statement and a purported corrective disclosure is exactly the

type of "important … unsettled legal question" that is likely to "escape effective review" absent interlocutory appeal. *Id.* at 1275.

The *Goldman I* mismatch doctrine serves as a critical check on securities class actions, and its proper application determines the outcome of some of the highest-value litigation in the country. Before *Goldman I*, although the *Basic* presumption could theoretically be rebutted under pre-*Goldman I* case law, as a practical matter securities class actions nearly always proceeded beyond the class certification phase because courts treated price impact as largely synonymous with market efficiency and materiality. *See Strougo v. Barclays PLC*, 312 F.R.D. 307, 324 (S.D.N.Y. 2016) (noting that rebutting the *Basic* presumption was not "easily done" and that the arguments available to defendants pre-*Goldman I* would "not ordinarily present a serious obstacle to class certification"); *e.g.*, *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 94-96 (S.D.N.Y. 2015) (defendants failed to rebut the presumption in inflation-maintenance case in part because there was a price reaction, which "is sufficient to show market efficiency").

*Goldman I* signaled that class certification should be a meaningful inquiry and a check on unfounded allegations of fraud. Commentators describe *Goldman I* as having made "significant changes to some of the core doctrines in securities law,"[4]

[4] Turk, *The Securities Fraud Class Action After Goldman Sachs*, 59 Am. Bus. L.J. 281, 281, 284 (2022).

leading to a "significant uptick in price impact challenges by defendants at class certification."[5] They simultaneously describe *Goldman I* as having "increas[ed] [the] number of tools" for courts "to act as gatekeepers on the merits of a litigation."[6]

The Supreme Court's purpose in clarifying the analysis has been thwarted, however, by the lack of particularized guidance. While *Goldman I* "directed [courts] to compare … the relative genericness of a misrepresentation with its corrective disclosure," *Arkansas Tchr. Ret. Sys. v. Goldman Sachs Grp.*, 77 F.4th 74, 81 (2d Cir. 2023) ("*Goldman II*"), the Supreme Court left many questions unanswered: it did not address what types of statements can fairly be considered generic, it left to the lower courts the task of determining whether there is a match in specificity between challenged statements and alleged corrective disclosures, and it did not indicate what analytical framework should govern the inquiry. *See also* Op.40.

No case outside the *Goldman* litigation itself has provided clarity on these questions. On remand from *Goldman I*, the Second Circuit proposed a three-part test. First, it considered, "as a factual matter, the generic nature of the alleged misrepresentation" to assess whether there is a "gap in … genericness" between the

---

[5] Ebersole et al., *The (Mis)Matching Game: Price Impact Challenges to Class Certification Five Years After Goldman*, 36 Class Actions & Derivative Suits 12, 14 (2026); *see also* Reed & Morrison, *Goldman Ruling Is a Boon for Class Action Defendants*, Law360 (June 21, 2021).

[6] Perino, *Private Securities Enforcement and the Roberts Court*, 99 St. John's L. Rev. 737, 748 (2026).

alleged misrepresentation and the associated alleged corrective disclosure. *Goldman II*, 77 F.4th at 102. Then it assessed "whether a truthful—but equally generic—substitute for the alleged misrepresentation would have impacted the stock price." *Id.* Finally, it "consider[ed] other indirect evidence of price impact," including reports published by financial analysts evaluating the company and providing investors with information on its stock, to determine "whether the defendant's generic statements on th[e] topic were important" to investors in making investment decisions. *Id.* at 102-03.

Since then, no other circuit case has engaged in a detailed analysis of a mismatch, much less explicitly endorsed the Second Circuit's three-part test. *See San Diego Cnty. Emps. Ret. Ass'n v. Johnson & Johnson*, 2025 WL 2176586, at *4 (3d Cir. July 30, 2025), *cert. denied*, 146 S. Ct. 2559 (2026); *In re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 614 (6th Cir. 2025) (noting that generic corporate statements at issue were "nearly identical to the misrepresentations in" *Goldman I* but engaging in no further mismatch analysis); *Jaeger v. Zillow Grp., Inc.*, 2025 WL 2741642, at *1-2 (9th Cir. Sep. 26, 2025) (emphasizing overlap between price impact and loss causation in inflation-maintenance cases and affirming certification

without articulating a detailed genericness analysis), *cert. denied*, No. 25-1365 (Oct. 5, 2026).[7]

This has left district courts "grappl[ing]" with the analysis and needing guidance.[8] The district court's order itself candidly acknowledges this uncertainty. The court questioned whether it was applying the correct approach given that "no court in the Eleventh Circuit has yet to evaluate a specificity mismatch at the class certification stage." Op.44. It also asked: "who decides what is an 'equally generic' substitute?" Op.45. And when it analyzed the alleged misstatements, it did so without applying any coherent framework and thus reached inconsistent results.

The court's confusion is not unique. District courts nationally have used conflicting approaches to analyze whether a mismatch exists. *See Shupe v. Rocket Cos.*, 752 F. Supp. 3d 735, 780-81 (E.D. Mich. 2024) (applying Second Circuit test); *In re Concho Res., Inc.*, 2025 WL 1040379, at *12-14 (S.D. Tex. Apr. 7, 2025) (applying *Goldman I* but not Second Circuit test); *In re Qualcomm Inc. Sec. Litig.*, 2023 WL 2583306, at *12-15 (S.D. Cal. Mar. 20, 2023) (same); *see also Ferris v. Wynn Resorts Ltd.*, 2023 WL 2337364, at *7 (D. Nev. Mar. 1, 2023) (noting lack of guidance as to class certification in inflation-maintenance securities cases).

---

[7] That the Supreme Court denied certiorari only heightens the need for circuit guidance.

[8] Ebersole, *supra* n.5 at 14; *see also* Saltzstein et al., *Securities Class Cert., 5 Years After Goldman Ruling*, Law360 (June 22, 2026).

The district court's order also exposes a separate unresolved question: the role of loss-causation case law in the price-impact inquiry. *Goldman I* made clear that courts must consider "*all* record evidence relevant to price impact," including "materiality or *any other merits issue*." 594 U.S. at 124 (second emphasis added). Applying this guidance, the Ninth Circuit concluded in *Zillow* that courts should consider loss causation principles, including whether the alleged disclosures revealed new, corrective information that could have caused the stock price decline, as part of the universe of evidence bearing on price impact at class certification. 2025 WL 2741642, at *2; *see also In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024) (back-end price decline supports price impact only if the alleged disclosure was new, corrective, and value-relevant). However, the court here rejected Defendants' argument to that effect. Op.32-33. This again creates conflicting law over how loss-causation cases should inform the price-impact analysis.

In addition to being an unsettled, important legal question, the proper application of *Goldman I* is extremely unlikely to reach this Court through a traditional appeal given how rarely securities cases reach final judgment. Thus, absent interlocutory review, this question—which courts must address in every inflation-maintenance securities class action that advances past a motion to dismiss—will continue to evade appellate resolution. And because event-driven

litigation is increasingly common, the need for circuit guidance is exacerbated. The court itself observed that after an event, securities plaintiffs frequently "find negative news and then point to any of a company's previous statements that touch upon a similar subject and allege fraud." Op.41. For this reason, class certification in securities class actions is often reviewed via Rule 23(f) appeals (including by this Court) given their size and the rarity of reaching a final verdict. *See, e.g.*, *Acuity Brands, Inc. v. Public Emps.' Ret. Sys. of Miss.*, No. 20-90018 (11th Cir. Nov. 18, 2020) (granting petition seeking guidance on how damages doctrine applies in securities-fraud cases); *West*, 282 F.3d at 937 (granting petition seeking guidance on reach of fraud-on-the-market doctrine); *see also Prado-Steiman*, 221 F.3d at 1275 (review warranted where "appellate ruling sooner rather than later will substantially assist the bench and bar"). And the fact that each circuit to address *Goldman I* did so on interlocutory review underscores that waiting for final judgment risks leaving these questions unresolved. *See Goldman II*, 77 F.4th at 80; *Johnson & Johnson*, 2025 WL 2176586, at *2; *FirstEnergy Corp.*, 149 F.4th at 597; *Zillow*, No. 24-5473 (9th Cir. Oct. 24, 2024).

This case therefore presents precisely the type of important, unsettled legal question contemplated by *Prado-Steiman*: the meaning and application of *Goldman I* remain contested, the district court itself acknowledged uncertainty regarding the governing standards, and absent interlocutory review, courts in the Eleventh Circuit

will remain without guidance on an issue that is increasingly recurring in event-driven securities litigation.

## II. THE OTHER *PRADO-STEIMAN* FACTORS WEIGH IN FAVOR OF GRANTING THE PETITION

The Court should also grant the petition for several ancillary reasons. First, the certification order contains "profound errors of law," *Prado-Steiman*, 221 F.3d at 1277, because the district court refused to decide questions that it deemed should be "reserved for a later, merits stage" and applied the wrong standard on certain questions that it did decide. Op.31, 36. The decision also "raises the cost and stakes of the litigation so substantially" that it calls into doubt whether this case will ever reach a final verdict. *Prado-Steiman*, 221 F.3d at 1274. Similarly, the nature, status, and foreseeable course of the litigation all favor review now; postponement would only expend resources litigating an improperly defined class. *See id.* at 1276.

### A. The District Court Made Profound Errors of Law

Immediate review is warranted because the district court made "profound errors of law" by applying the wrong standard on multiple issues. *Prado-Steiman*, 221 F.3d at 1277. Immediate review is needed where a court "overlooks directly controlling precedent," *id.* at 1275, particularly where "the alleged error arises out of a mistake of law," *id.* at 1275 n.9; *see, e.g.*, *DAL v. Siegel*, No. 16-90013 (11th Cir. July 26, 2016) (arguing mistake of law under predominance inquiry); *id.* (Oct. 7, 2016) (granting petition); *FirstEnergy Corp.*, No. 26-0303 (6th Cir. Sep. 28, 2026)

(granting petition arguing district court misapplied damages doctrine). The district court (1) improperly deferred to the merits phase questions that must be answered before certifying a class; (2) failed to apply the preponderance-of-the-evidence standard; (3) refused to assess whether alleged corrective disclosures were new despite *Goldman I*'s directive that courts consider all probative evidence of price impact; and (4) held that statements were specific based only on unchallenged representations not about safety.[9]

First, the district court failed to decide crucial questions because it held that they were merits issues, despite clear guidance from *Goldman I* that "a court has an obligation before certifying a class to 'determin[e] that Rule 23 is satisfied, *even when that requires inquiry into the merits*.'" 594 U.S. at 122 (emphasis added). For instance, the court elected not to determine "which statements among many interrelated statements truly led to the price increase," reasoning that the issue "invites a merits question that is unnecessary" to resolve at class certification. Op.30-31. Similarly, the court reserved for "a later, merits stage" the question of "[t]he extent to which any particular disclosure affected share price." Op.36.

---

[9] This petition addresses only certain of the district court's errors. Should this Court grant review, Defendants reserve the right to raise any other "issue fairly included within the [class certification] order." *BP P.L.C. v. Mayor & City Council of Baltimore*, 593 U.S. 230, 241 (2021).

Second, the court repeatedly applied the wrong standard to its assessment of price impact. It held that Defendants had failed to rebut the presumption as to front-end price impact because "it is plausible that the price impact could have been caused, at least in part, by Norfolk's alleged misrepresentations." Op.31. Whether front-end price impact is "plausible" is not the inquiry. The relevant question is whether, considering the entire record, Defendants had proven "a lack of price impact *by a preponderance of the evidence*." *Goldman I*, 594 U.S. at 117 (emphasis added). Later, the court rejected Defendants' argument that the alleged corrective disclosures instead merely reflected the materialization of a known risk because "Defendants are tasked here with refuting price impact entirely." Op.38. Nothing in *Goldman I* imposes such a burden. In fact, *Goldman I* cautioned that "the burden of persuasion should rarely be outcome determinative." 594 U.S. at 117. Again, Defendants need only persuade the court, based on all available evidence, that it is more likely than not that the alleged misrepresentations had no price impact. *See id.*; *United States v. Deleveaux*, 205 F.3d 1292, 1296 n.3 (11th Cir. 2000) (preponderance requires showing outcome "more likely true than not true").

Third, the court erroneously refused to consider whether each alleged corrective disclosure contained new information—and therefore was not corrective—when analyzing price impact. Op.34; *see FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1311 n.28 (11th Cir. 2011) (corrective disclosure

"obviously must disclose new information"). The court concluded that it need not evaluate each alleged corrective disclosure separately at class certification and evaluated only the final alleged corrective disclosure to determine whether it revealed new information. Op.34-36. This approach defies *Goldman I*'s instruction that courts consider "*all* evidence relevant to price impact," including whether "*the disclosure corrected an earlier misrepresentation*." 594 U.S. at 122-23 (second emphasis added). The Ninth Circuit has confirmed that it is appropriate to "look[] to loss-causation case law for guidance" when assessing price impact. *Zillow*, 2025 WL 2741642, at *1. Yet the court did not do so. Op.35-36.

This approach also disregards binding Eleventh Circuit loss causation law. When assessing the merits of a securities claim, courts must assess "*each* [alleged corrective disclosure] in turn, and explain why none qualif[ies] as a corrective disclosure." *Meyer*, 710 F.3d at 1197 (emphasis added). *MacPhee v. MiMedx Group, Inc.*, another loss causation case, held the same. 73 F.4th 1220, 1244-49 (11th Cir. 2023). Contrary to the district court's characterization, neither *Meyer* nor *MacPhee* suggests that courts can focus exclusively on the final alleged corrective disclosure. Op.35-36. Both decisions concluded that no alleged disclosure revealed new information only after examining each disclosure in turn. *Meyer*, 710 F.3d at

1197-1202; *MacPhee*, 73 F.4th at 1244-49. Yet the district court declined to undertake that same analysis. Op.35-36.[10]

Finally, the court drew arbitrary distinctions among the statements, relying on unchallenged operational details to conclude that certain "operational" statements were specific enough to match the alleged corrective disclosures. For example, the court found a sufficient match between the alleged corrective disclosures and the representation that Norfolk Southern had "decentralized [its] training and gotten it down to a … 'much shorter period of time.'" Op.11 (quoting ¶ 437). Yet no corrective disclosure is alleged to have revealed that Norfolk Southern misrepresented the length of its training program. Such operational details, which were never purportedly corrected, cannot supply the necessary match. *See Meyer*, 710 F.3d at 1197 (corrective disclosure must relate to misrepresentation, "not to some other negative information about the company").

That approach led the court to draw distinctions without a meaningful difference among materially similar statements. Aside from unchallenged operational details, the statements share the same level of specificity as the seventeen safety statements that the court excluded. For example, the court deemed the

---

[10] The court inaccurately stated that *MacPhee* "failed to identify *any* alleged disclosure that contained new information" as a justification for its approach. Op.35 (emphasis added). But some disclosures in *MacPhee* were new—they simply were not corrective. 73 F.4th at 1245, 1248.

statement that Norfolk Southern's programs were designed to "provide safe, efficient, and reliable rail transportation services" too generic to match the alleged corrective disclosures, Op.13, 54, yet found sufficiently specific a statement that Norfolk Southern's efforts to "enhance the capacity and capability of [its] network … directly or indirectly improve safety," Op.12, 51. Both convey the same general message about Norfolk Southern's commitment to safe operations. The court provided no principled basis for treating one as a mismatch but not the other.

The court's treatment of the operational statements is also difficult to reconcile with the dismissal of a bondholder securities class action arising from the same accident and involving many of the same statements on a motion to dismiss. *In re Norfolk Southern Corp. Bond/Note Sec. Litig.*, 2026 WL 555420 (2d Cir. Feb. 27, 2026). The Second Circuit affirmed the dismissal of all the statements in that case as puffery, which stands in contrast with the district court's finding here that the operational statements were not so generic as to be a mismatch with specific alleged corrective disclosures.

If statements such as safety being "core to our business strategy," and the business model being "'designed to assure … safe, efficient, and reliable' operations" qualify as puffery, *Norfolk Southern Corporation Bond/Note*, 2026 WL 555420, at *1, they are too general to match the far more specific corrective disclosures alleged here, and therefore cannot have impacted price, *see Goldman I*,

594 U.S. at 122 ("[A] more-general statement will affect a security's price less than a more-specific statement on the same question."). Yet the district court here treated materially similar safety statements, including Norfolk Southern's representation that it "delivered record productivity levels while providing safe and reliable freight solutions," ¶ 408, as meaningfully different, Op.9, 51.

### B. The Court Should Not Delay Review

The remaining three factors announced in *Prado-Steiman* all support immediate review as well. Given the size of the damages alleged, a "rational defendant" would feel "pressure to settle." 221 F.3d at 1274. This pressure is borne out in the statistics: securities class actions rarely make it to final judgment. By certifying a class of purchasers spanning more than two years, the district court's decision magnifies the stakes of Plaintiffs' claims—however meritless—creating precisely the settlement pressure that *Prado-Steiman* seeks to prevent.

The nature and status of the litigation and future events likely to occur also support immediate review. *See Prado-Steiman*, 221 F.3d at 1276. Securities class actions are uniquely shaped by the class-certification decision. Future proceedings, including expert discovery, summary judgment, and potentially trial, will all be based on the set of statements defined in the class certification order. If it proves incorrect, substantial resources will have been expended litigating claims that should never have proceeded on a class-wide basis. *See id.* (courts should consider the

"impact … of rulings by the district court that, while not themselves subject to Rule 23(f) review, nevertheless are inextricably tied to the class certification decision"). Moreover, postponing review will not materially improve the record given that the issues in question are legal, not factual. *See Ocwen Loan Servicing LLC v. Belcher*, 2018 WL 3198552, at *5 (11th Cir. June 29, 2018) (declining Rule 23(f) review where underdeveloped record would leave court "unable to resolve the relevant issues"). Review now will allow this Court to determine whether any class may properly be certified to avoid substantial wasted resources litigating claims on behalf of a class that should never have been certified.

**CONCLUSION**

The Court should grant Defendants' Rule 23(f) petition.

Dated: October 13, 2026

Respectfully submitted,


*/s/ Michael G. Bongiorno*
MICHAEL G. BONGIORNO
TAMAR KAPLAN-MARANS
WILMER CUTLER PICKERING
HALE AND DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
Tel: (212) 230-8800
Fax: (212) 230-8888
michael.bongiorno@wilmerhale.com
tamar.kaplan-marans@wilmerhale.com

PETER J. KOLOVOS
SOFIE C. BROOKS
ELIZABETH J. BEDRICK
THERESE J. BROWN
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
Tel: (617) 526-6000
Fax: (617) 526-5000
peter.kolovos@wilmerhale.com
sofie.brooks@wilmerhale.com
liz.bedrick@wilmerhale.com
therese.brown@wilmerhale.com

*Counsel for Defendants Norfolk Southern Corporation, James A. Squires, Alan H. Shaw, and Cynthia M. Sanborn*

**CERTIFICATE OF COMPLIANCE**

I hereby certify that this petition complies with the type-volume limitation of Fed. R. App. P. 5(c)(1) because this petition contains 5,143 words, excluding the parts exempted by Federal Rule of Appellate Procedure 32(f).

This petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word Times New Roman 14-point font.

Date: October 13, 2026

*/s/ Michael G. Bongiorno*
Michael G. Bongiorno

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system.

I further certify that I have mailed the foregoing document by Federal Express, postage prepaid, for delivery within 3 calendar days, to the following:

NATHAN A. HASIUK
DANIEL A. FRIEDMAN
VANESSA M. MILAN
ALEC S. GARBER
KESSLER TOPAZ
MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087

MICHAEL A. CAPLAN
CAMERON B. ROBERTS
ANNIE BORING
CAPLAN COBB LLC
75 Fourteenth Street, NE,
Suite 2700
Atlanta, GA 30309

JASON C. DAVIS
ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street,
Suite 1800
San Francisco, CA 94104

ASHLEY M. PRICE
PETER KO
MARK CONOVER
JACK ABBEY GEPHART
ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Ste. 1900
San Diego, CA 92101

JOHN C. HERMAN
HERMAN JONES LLP
3424 Peachtree Road NE,
Suite 1650
Atlanta, GA 30326

JOSEPH F. MURRAY
MURRAY MURPHY MOUL
+ BASIL LLP
1114 Dublin Road
Columbus, OH 43215

Date: October 13, 2026

*/s/ Michael G. Bongiorno*
Michael G. Bongiorno

# Addendum

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| BUCKS COUNTY EMPLOYEES RETIREMENT SYSTEM, *et al.*, *individually and on behalf of all others similarly situated*,<br>Plaintiffs,<br>v.<br>NORFOLK SOUTHERN CORPORATION, *et al.*,<br>Defendants. | Civil Action No.<br>1:23-cv-04175-SDG |

**OPINION AND ORDER**

This matter is before the Court on the Motion for Class Certification, Appointment of Class Representatives, and Appointment of Class Counsel, filed by Co-Lead Plaintiffs AkademikerPension[1] and Ironworkers Locals 40, 361 & 417 Union Annuity, Pension and Topping Out Funds [ECFs 185, 235].[2] After careful consideration, and with the benefit of oral argument, Plaintiffs' motion to certify a class of persons who acquired common stock in Defendant Norfolk Southern Corporation between October 28, 2020 and March 3, 2023 is **GRANTED**, but as to

1 The Motion for Class Certification refers to Plaintiff AkademikerPension as "Akademikernes Pensionskasse," *see* ECF 235, at 5, though parties have at other times referred to that entity by the former name, *see, e.g.,* ECF 24. Because AkademikerPension does not request that it be called by a different name, the Court will refer to it by the name previously used in this litigation and reflected on the docket, for purposes of consistency.

2 To the extent that this Order references statements filed under seal, the Court has determined that those statements should not have been sealed.

a significantly narrower set of alleged misstatements and with a shortened class period.

## I. Background

### A. The Allegations

A detailed description of the allegations in this case is set forth in this Court's March 24, 2025 Order denying the motion to dismiss filed by Defendants Norfolk Southern Corporation (Norfolk or the Company); James A. Squires; Alan H. Shaw; and Cynthia M. Sanborn.[3] To summarize, Plaintiffs allege the following:[4]

In 2019, Norfolk—a freight railroad company—embraced a new "cut-to-the-bone"[5] operational strategy called "PSR," short for "precision-scheduled railroading."[6] In theory, PSR boosts profits and increases efficiency by (1) reducing staff, (2) reducing assets, and (3) running fewer trains.[7] In practice, PSR required running "long trains that transport larger and heavier loads with fewer workers in less time."[8] In Norfolk's case, PSR meant increasing the length of a typical train

---

3 ECF 115.

4 For purposes of this Order, the allegations summarized in this Background section are just that—allegations made by the Plaintiffs.

5 ECF 82, ¶ 77. The amended complaint at ECF 82 is the operative complaint.

6 *Id.* ¶ 531.

7 *Id.* ¶ 72.

8 *Id.* ¶ 73.

from around 100 cars to over 200,[9] and cutting personnel by nearly 40 percent.[10] Norfolk's new embrace of PSR yielded the profit-increasing results its management sought: the Company's operating ratio, an indicator of how efficiently a railroad generates revenues,[11] improved substantially in the first year of its PSR launch.[12] And when the Covid-19 pandemic hit and the railroad industry writ-large experienced disruptions to freight demands, Norfolk weathered the impact by "pressing the [PSR] accelerator" to "continue to drive down costs."[13] All the while, Norfolk assured investors that it was implementing PSR "without sacrificing safety":[14] In its annual reports;[15] during earnings calls;[16] at industry conferences;[17] and under oath before Congress,[18] Norfolk reiterated its continuing commitment to safety.

---

9 *Id.* ¶ 135.

10 *Id.* ¶ 109.

11 *Id.* ¶ 6.

12 *Id.* ¶¶ 80, 81.

13 *Id.* ¶ 82.

14 *Id.* ¶ 417.

15 *Id.* ¶¶ 422, 424, 427, 433, 434.

16 *Id.* ¶¶ 407, 409, 418, 419, 425, 431, 437, 438.

17 *Id.* ¶¶ 439, 440, 443.

18 *Id.* ¶¶ 416, 417, 429, 441.

Plaintiffs allege that Defendants' public comments about the Company's commitment to safety throughout its implementation of this new operational strategy—and their omissions as to the true risks of PSR—were materially false and misleading.[19] While repeatedly assuring investors about the safety of its operations, Norfolk was taking on increased risks: building out trains to "astronomical lengths";[20] loading them with tens of thousands of tons of freight;[21] and running them as fast as it could.[22] Norfolk often arranged its trains in violation of federal regulations, with hazardous materials too close to the engine,[23] and without regard for weight distribution, risking more frequent and more dangerous derailments when the trains' brakes were applied.[24] Norfolk also made drastic cuts to its workforce,[25] letting go of many of its most experienced workers; regularly staffing its trains with "skeleton crews" of just two people;[26] and significantly reducing training programs for new employees.[27]

---

19 *Id.* ¶¶ 1–24, 510.

20 *Id.* ¶ 123.

21 *Id.* ¶ 139.

22 *See id.* ¶ 463.

23 *Id.* ¶¶ 127–128.

24 *Id.* ¶¶ 124–126.

25 *Id.* ¶ 141.

26 *Id.* ¶¶ 116, 129.

27 Id. ¶¶ 142–148, 150–151, 158–159.

At the same time that Norfolk was entrusting increasingly unqualified crews with operating increasingly gigantic trains, it was also making those trains increasingly difficult to properly inspect and repair. Norfolk reduced maintenance personnel; decimated the ranks of its qualified mechanical inspectors; and required those mechanical inspectors to work longer shifts with shorter inspection times for each train.[28] The Company reduced the effectiveness of its "wayside detectors"—sensors meant to catch defects missed by in-person inspections—by spreading them further apart, making it more difficult for crews to respond to alerts and, at times, even instructing crews to ignore alerts altogether.[29]

According to Plaintiffs, the alleged emptiness of Norfolk's commitment to safety came to light with a series of disclosures, beginning with the February 3, 2023 derailment of one of its trains in East Palestine, Ohio.[30] That evening, a 1.75-mile, 149-car, 18,000-ton Norfolk train, staffed by inexperienced crews, crashed, causing thirty-eight cars to derail.[31] Some of the derailed cars contained a combustible fluid (vinyl chloride) that quickly leaked out and erupted into

---

[28] *Id.* ¶¶ 110, 113–114, 163, 168, 180–181.

[29] *Id.* ¶¶ 17, 175, 207, 210, 213–214, 222–225, 228.

[30] *Id.* ¶¶ 2, 20.

[31] *Id.* ¶¶ 2–4, 160.

flames.[32] The resulting "inferno" burned for days.[33] To resume freight service through East Palestine as soon as possible,[34] Norfolk conducted a "vent-and-burn": it blasted holes in the bottom of the tank cars containing the vinyl chloride; drained the chemical onto the ground; and lit the vinyl chloride on fire,[35] which sent it up into the atmosphere in a billowing cloud of dark chemical smoke.[36] Norfolk resumed service through East Palestine four days later, on February 7.[37] But the public eye was narrowed in on Norfolk: in the days and weeks that followed, news outlets released articles about Norfolk that scrutinized its PSR practices;[38] various regulatory agencies began investigations into the cause of the derailment and released letters and reports regarding its consequences;[39] and various governmental bodies, officials, and unions made statements connecting

---

32 *Id.* ¶ 278.

33 *Id.* ¶ 278 & n.13.

34 *Id.* ¶ 285.

35 *Id.* ¶¶ 353, 370.

36 *Id.* ¶ 357.

37 *Id.* ¶ 361.

38 *Id.* ¶¶ 520, 540–541.

39 *Id.* ¶¶ 522–523, 533.

Norfolk's PSR strategies to the catastrophic event.[40] When two additional Norfolk trains derailed on February 17 and March 4, public scrutiny only intensified.[41]

Based on the foregoing allegations, Plaintiffs brought this action against Norfolk and Norfolk executives for violations of the Securities Exchange Act of 1934, and seek to represent a class of all persons or entities who purchased or otherwise acquired Norfolk common stock between October 28, 2020 and March 3, 2023 (the Class Period).[42]

### B. The Alleged Misrepresentations

The two-count Complaint is based upon 35 purported false and misleading statements and omissions Defendants allegedly made during the Class Period.[43] According to Plaintiffs, Defendants misled investors by describing Norfolk's operations as safe despite knowing that its PSR changes were adding increased risk of catastrophe. The statements Plaintiffs identify vary in levels of specificity.

---

40 *Id.* ¶¶ 528–531, 534–537.

41 *Id.* ¶¶ 532, 534.

42 ECF 82.

43 *See* ECF 99-1; *See generally* ECF 82.

Some are undeniably vague and primarily extol safety in the abstract. The Court will label these as the "company values statements," and they are:

- The Board is committed to safety as a core value of Norfolk Southern, and we review safety topics regularly.[44]
- Safety is a way of life at Norfolk Southern.[45]
- Safety is part of who we are. Safety is core to our business and essential to achieving operational excellence.[46]
- Every conversation begins with safety in 2023 and beyond. Operating safely is the right thing for our employees, customers, shareholders and the communities that we serve. This is an area where we have made great strides, but even one serious incident is too many.[47]
- We are dedicated to providing employees with a safe workplace and the knowledge and tools they need to work safely and return home safely every day. Our commitment to an injury-free workplace is illustrated by our 'I am Coming Home' safety message, which is featured prominently in our yards, shops, and facilities and further reinforces the importance of working safely.[48]
- The most important factor in achieving continuous safety improvement is the creation of a company culture that promotes safety through continuous education and reinforcement of safe behaviors. This is why railroads

---

44 ECF 82, ¶ 410.

45 *Id.* ¶ 411.

46 *Id.* ¶ 415.

47 *Id.* ¶ 419.

48 *Id.* ¶¶ 422, 424, 427. This statement was repeated on two different occasions.

> work very hard to train their employees and instill in them a high level of safety awareness in everything they do.[49]

But other statements are more substantive, addressing Norfolk's purportedly safe implementation of certain PSR measures to improve efficiency. The Court will label these as the "operational statements," and they include:

- During the fourth quarter, we saw volumes continue their climb from pandemic induced lows earlier in the year. So the mission of the operating team was handling more business while reducing resources and improving productivity. Our push for efficiency led to record train weight and record train length in the quarter. These larger trains, combined with our strategy of better matching train size and locomotive horsepower, drove us to record fuel efficiency and enabled us to get the job done with a smaller workforce and a record low count of locomotives. I also have to thank the people that make up our operations team and all crafts. We achieved these records due to their hard work and most importantly, we did so safely.[50]

- During a year of unprecedented market disruption and uncertainty, the Norfolk Southern team delivered record productivity levels while providing safe and reliable freight solutions for our customers.[51]

- We have continued operating safely and reliably throughout the COVID-19 pandemic. Despite inherent challenges, we've advanced our long-term strategic goals to build a faster, more efficient and technologically innovative railroad. We've reduced our company's

---

49 *Id.* ¶ 441.

50 *Id.* ¶ 409.

51 *Id.* ¶ 408.

resource needs, exercise[d] strong financial discipline and achieved consistent operating ratio improvement. We're now accelerating our implementation of precision scheduled railroading principles to drive the productivity and efficiency of our organization even further, helping us better serve customers, support growth and drive long-term value.[52]

- At a fundamental level, precision scheduled railroading is about using assets in the most efficient manner possible without sacrificing safety. . . . None of the three elements listed—safety, customer service, or returning value to shareholders—has to come at the expense of the others. Safety is paramount.[53]

- I think train length really helps us right now. It improves our lessons or labor intensity. Now, there's a point to which if you're unable to meet trains at multiple locations on a particular district, it could work against you, to your point. But I think where we are finding opportunities to move more traffic with one crew, that is really to our advantage. So I don't see it working against us both near term, nor do I see it working against us long term. We want to be able to match our train size to our locomotive pulling capability. And as we invest in locomotives, and you've heard me talk about that in our prepared remarks, with DC [direct current] to AC [alternating current] conversions, it's very helpful to us to improve train length. From the standpoint of what the STB [Surface Transportation Board] might do, I don't know. I know that it is a topic that even FRA [Federal Railroad Administration] brings up from time to time. But I truly believe that the technology that's brought to us with distributed power capability, makes it a very safe and effective operation. I don't see a reason that we should expect or want or think necessary, any

---

[52] *Id.* ¶ 412.

[53] *Id.* ¶ 417.

restrictions on train length, as long as we're continuing to move fluidly and not getting longer than the district that we need to run on.[54]

- We've kind of decentralized our training and gotten it down to a short—a much shorter period of time, about eight weeks—where we're actually training folks in the places where they're going to work. So they're still going to be a very safe employee, but we are able to condense the amount of sort of speed, I guess, improve the speed to market, if you will, and respond to needs of service.[55]

- We have streamlined our process of hiring and also our training process, taking advantage of technology to do so. Obviously, we're not going to compromise safety in anything that we do with that regard.[56]

- It's going to take us 3 to 4 months to train crews because we're not going to cut corners on safety. That's really important for us. And we got to make sure that our conductors are well trained as they go out into the field.[57]

- We've got well over 800 in our training class now, again, it will take 4 or 5 months for those folks to become qualified to work productively and safely.[58]

- We remain steadfast in our commitment to service recovery. In the quarter, we made considerable progress on staffing, and launched our TOP|SPG operating model, both of which are foundational to achieving our targeted service levels and long-term growth strategy. Already we are seeing visible upticks in qualified employees and train speeds as a result of these

---

[54] *Id.* ¶ 431.

[55] *Id.* ¶ 437.

[56] *Id.* ¶ 438.

[57] *Id.* ¶ 440.

[58] *Id.* ¶ 443.

initiatives, and we expect to see further progress on service recovery in the months ahead.[59]

- [I]f an operating practice is unsafe, we will change it. If an employee acts in an unsafe manner, that will be addressed. If we are bringing on new employees, we will not rush the process such that they are not properly trained to be able to safely do the work we need them to do. We work very hard to instill in our employees a high level of safety awareness in everything they do. We also spend enormous amounts of capital to expand and enhance the capacity and capability of our network; virtually all of those investments directly or indirectly improve safety in some way.[60]

And some statements fall somewhere in between. The Court will label these statements as the "mixed statements," and they include:

- We have seen improvement in both FRA train accidents per ton miles moved as well as the FRA injury index year-over-year. We will not be satisfied as long as there is a single injury or accident, which is why we continue our efforts to get better in this area every day.[61]

- [Norfolk is] the world's safest, most productive and lowest-cost freight rail service. . . . For [Norfolk,] . . . pursuing safe operations is not optional; it's a business imperative.[62]

- I am very happy with the progress we've made on our safety initiatives and translating that to fewer injuries and train accidents. Especially with large numbers of new employees starting out in the field, this reinforces

---

59 *Id.* ¶ 442.

60 *Id.* ¶¶ 416–417.

61 *Id.* ¶ 425.

62 *Id.* ¶ 416.

that all of our employees, tenured and new alike are laser-focused on running a safe operation.[63]

- [Norfolk employees are] dedicate[ed] to operating this railroad as efficiently and safely as possible while continuing to deliver for our customers during these unprecedented times.[64]

- And I want to recognize these employees for their dedication to operating this railroad as efficiently and safely as possible over the unprecedented times in the past year, while at the same time, delivering for our customers and our country.[65]

- The men and women of Norfolk Southern put their boots on every day and work hard to provide a safe, efficient, and reliable service product for our customers . . . . For Norfolk Southern—and I'm sure I can speak for all railroads here too—pursuing safe operations is not optional; it's a business imperative. We have an obligation to operate safely for the benefit of our employees, our customers, and the communities where we operate.[66]

- Safety extends to hazardous materials too; well over 99.99% of rail hazmat shipments reach their destination without a release caused by a train accident.[67]

- Our capital spending and replacement programs are and have been designed to assure the ability to provide safe, efficient, and reliable rail transportation services.[68]

---

63 *Id.* ¶ 418.

64 *Id.* ¶ 407.

65 *Id.* ¶ 414.

66 *Id.* ¶ 416.

67 *Id.* ¶ 429.

68 *Id.* ¶¶ 433–434. This statement was repeated on two different occasions.

Plaintiffs also point to statements Defendants made following the East Palestine derailment concerning the need to conduct the vent and burn. The Court will label them the "vent and burn statements," and they include:

- Governor DeWine and Columbiana County officials are issuing an urgent warning to those living within a mile of the derailment. Within the last two hours, a drastic temperature change has taken place in a rail car, and there is now the potential of a catastrophic tanker failure which could cause an explosion with the potential of deadly shrapnel traveling up to a mile.[69]

- The process that we're going to do today, we're going to place a small-shaped charge. It's going to create a hole about two and a half to three inches in the tank car. This will allow the material to come out of the tank car, it'll go into a pit and trench that we have dug and set up for this operation. Inside that trench will be flares aligning that trench that then will light off the material. We're doing this so that we control this tank car that we have concerns with, these tank cars. This allows us to control that operation and not have the car react and do it itself. So that's what we're going to be doing later on today.[70]

- If the car started to react again—the cars, I keep saying car. If they started to react on their own again, we can't control that time of day when that would occur. That would, in turn—we would have to worry about an inversion and other things weather-related. Okay. So we want to do it in the daylight, you know, close to—you

---

[69] *Id.* ¶¶ 446, 513. Plaintiffs also allege that Defendants made one statement through Ohio Governor Mark DeWine, asserting they used Governor DeWine as a "conduit" to disseminate false or misleading statements concerning the purported need for the vent and burn. *Id.* ¶¶ 445–448, 513.

[70] *Id.* ¶ 449.

know, prior to sunset as possible. That's—that's our plan right now.[71]

- Okay, so our controlled explosion, as I was telling you will put a two, three inch hole in the car. If we don't do that, the car could continue to polymerize and the entire car will break apart. We can't control where that goes. So that's the reason for doing this. Get moving on this. So we don't have to run into that letting the car do it itself. We want to be able to control that situation. That's the safest way is to control the situation. And that's what this operation we're going to take this afternoon.[72]

- The controlled breach of several rail cars has been completed successfully under the supervision of experts and first responders. Some of the material is now burning off consistent with expectations from the earlier models, and is expected to drain for a short number of hours. We have been, and will continue, monitoring air quality with the Ohio EPA. Remediation work at the site can now safely continue.[73]

According to Plaintiffs, these statements, taken together, misrepresented and concealed the massive risks Defendants were taking on with their adoption and implementation of PSR; under Plaintiffs' theory, Defendants were touting the Company's safety record and commitment to continuing operations with the same regard for safety while knowing full well that PSR compromised Norfolk's ability to conduct freight operations as safely as they had historically been conducted.[74]

---

71 *Id.* ¶ 450.

72 *Id.* ¶¶ 355, 451.

73 *Id.* ¶ 453.

74 *Id.* ¶¶ 509–10.

### C. The Alleged Disclosures

Plaintiffs allege that Defendants' misrepresentations and omissions all came to light with a string of disclosures that, both individually and collectively, revealed the increased risks and heightened disregard for safety that Defendants embodied during the Class Period.[75] Those disclosures are:

- The February 3, 2023 East Palestine derailment and the news reports that immediately followed it.[76]
- The February 5, 2023 evacuation order issued by Governor DeWine. DeWine warned of "the potential of a catastrophic tanker failure which could cause an explosion with the potential of deadly shrapnel traveling up to a mile."[77]
- The February 6, 2023 vent and burn order and the news reports that immediately followed it.[78]
- A February 9, 2023 Yahoo Finance article, titled "Norfolk Southern is giving $25,000 to an OH town where it caused a life-or-death evacuation." The Yahoo Finance article included statements such as, "[t]he derailment was reportedly due to a mechanical problem, but some are blaming the incident on weak safety regulations and the company's cost-cutting measures." It further stated: "Safety concerns have also grown amid Norfolk Southern's implementation of 'precision scheduled railroading,' an operations policy criticized as a corporate money grab. To cut costs, the company has slashed jobs by more than a fifth since 2017, ignoring

---

[75] *Id.* ¶¶ 511–12.

[76] *Id.* ¶ 513.

[77] *Id.*

[78] *Id.* ¶¶ 514, 517–518.

concerns that understaffing could impact railway safety."[79]

- A February 9, 2023 PBS article, titled "Ohio derailment that released toxic chemicals raises railroad safety questions." The PBS article noted that the East Palestine derailment "has highlighted the potentially disastrous consequences of train accidents and raised questions about railroad safety." Speaking to the industry's widespread adoption of PSR, the article also quoted Greg Regan, president of the AFL-CIO's Transportation Trades Department coalition, as stating: "They're really just trying to squeeze as much productivity out of these workers as they can . . . . And when you're focused on timing and rushing, unfortunately sometimes things can fall through the cracks."[80]

- A February 10, 2023 letter that the EPA sent to Norfolk. The letter detailed the extent of the environmental contamination, stating that the EPA "has documented the release or threat of release of hazardous substances, pollutants or contaminants into the environment from the East Palestine Train Derailment Site." It further stated: "Cars containing vinyl chloride, butyl acrylate, ethylhexyl acrylate, and ethylene glycol monobutyl ether are known to have been and continue to be released to the air, surface soils, and surface waters." The EPA concluded that Norfolk "may be responsible under CERCLA for cleanup of the Site or costs" and notified Norfolk of its "potential liability with regard to this matter." Relatedly, on February 13, 2023, NPR reported on the EPA letter.[81]

- A February 15, 2023 Associated Press article, titled "Ohio Attorney General Dave Yost considers suing Norfolk

---

[79] *Id.* ¶ 520.

[80] *Id.*

[81] *Id.* ¶¶ 522–524.

Southern following train derailment." The article included a quote from Yost stating: "The pollution, which continues to contaminate the area around East Palestine, created a nuisance, damage to natural resources and caused environmental harm."[82]

- A February 15, 2023 letter sent by then-United States Senators Sherrod Brown; J.D. Vance; Robert P. Casey, Jr.; and John Fetterman addressed to National Transportation Safety Board Chairwoman Jennifer Homendy raising concerns about rail safety in light of the East Palestine derailment. In their letter, the Senators "note[d] several factors and concerns that we have heard from our constituents, outside experts, and representatives of railroad workers."[83]

- A February 15, 2023 letter sent by then-Senators Marco Rubio and J.D. Vance, and addressed to then-Department of Transportation Secretary Pete Buttigieg. It stated that "[c]urrent and former rail workers, industry observers, and reform advocates had pointed to precision-scheduled railroading (PSR), by which rail companies such as Norfolk Southern increase efficiency and drive down costs by moving more freight with fewer workers, as a potential contributor to the accident."[84]

- The February 16, 2023 derailment of a Norfolk train in Van Buren Township, Michigan, and accompanying news reports. That same day, the White House Press Secretary Karine Jean-Pierre promised to "hold Norfolk Southern accountable." Media outlets, including Bloomberg and Axios, repeated Secretary Jean-Pierre's statements.[85]

---

82 *Id.* ¶ 528. *See also* ECF 216-4, ¶ 61 & n.190.

83 ECF 82, ¶ 529.

84 *Id.* ¶¶ 530–531.

85 *Id.* ¶¶ 530–534.

- A February 16, 2023 statement from railroad union SMART that connected the East Palestine derailment to PSR. Speaking of the industry's widespread adoption of PSR, the union's statement said: "All of this has been done in the name of reducing the only metric valued by PSR: operating ratio. In the name of improved operating ratios, the car departments and track maintenance departments have been ordered to do more with less. Reduced staffing levels and the increased number of cars per train have made it impossible for these railroad professionals to properly inspect equipment to ensure its safety."[86]

- Seven identical letters sent by United States Senator Maria Cantwell to the CEOs of Class I railroads, including Norfolk. These February 17, 2023 letters requested information and documents regarding the rail safety practices and transportation of hazardous materials.[87]

- The March 4, 2023 derailment of a Norfolk train near Springfield, Ohio.[88]

- Norfolk's March 6, 2023 announcement of a six-point plan to "immediately enhance the safety of its operations."[89]

## II. Legal Standard

A class action may be maintained only when it satisfies all the requirements of Fed. R. Civ. P. 23(a) and at least one of the alternative requirements of Rule

---

86 *Id.* ¶¶ 535–536.

87 *Id.* ¶ 537.

88 *Id.* ¶ 543.

89 *Id.* ¶ 544; ECF 216-4, ¶ 68.

23(b). *Jackson v. Motel 6 Multipurpose, Inc.*, 130 F.3d 999, 1005 (11th Cir. 1997) (footnotes omitted). Rule 23(a) requires Plaintiffs to show that:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). "These four requirements commonly are referred to as the 'prerequisites of numerosity, commonality, typicality, and adequacy of representation,' and they are designed to limit class claims to those 'fairly encompassed' by the named plaintiffs' individual claims." *Piazza v. Ebsco Indus., Inc.*, 273 F.3d 1341, 1346 (11th Cir. 2001) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 156 (1982)).

If Rule 23(a) is satisfied, Rule 23(b) further provides that a class action may be maintained only where one of the three following requirements is met:

> (1) prosecuting separate actions by or against individual members of the class would create a risk of prejudice to the party opposing the class or to those members of the class not parties to the subject litigation, *see* Fed. R. Civ. P. 23(b)(1);
>
> (2) the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive or declaratory relief is

appropriate respecting the class as a whole, *see* Fed. R. Civ. P. 23(b)(2); or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fair and efficient adjudication of the controversy, *see* Fed. R. Civ. P. 23(b)(3).

Under Fed. R. Civ. P. 23(b)(3), the Court considers matters including:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

The party seeking class certification bears the burden of showing that the Rule 23 requirements are met. *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1187 (11th Cir. 2003).

"Rule 23 grants courts no license to engage in free-ranging merits inquiries at the certification stage," and the merits of a suit may be considered "only to the extent [ ] that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). Nevertheless, courts must perform a "rigorous analysis" to ensure that Rule 23's requirements are satisfied before certifying a class, *Falcon*,

457 U.S. at 161, even where some of the requirements are not in dispute, *Valley Drug Co.*, 350 F.3d at 1188, or where the Court must decide disputed questions of fact that bear on the inquiry, *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233–34 (11th Cir. 2016); *see also Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) ("Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc."); *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305, 307 (3d Cir. 2008) ("Factual determinations supporting Rule 23 findings must be made by a preponderance of the evidence."). This "rigorous analysis" frequently "entail[s] some overlap with the merits of the plaintiff's underlying claim." *M. H. v. Berry*, 2017 WL 2570262, at *3 (N.D. Ga. June 14, 2017) (citing *Dukes*, 564 U.S. at 351).

## III. Predominance Under Rule 23(b)

The parties' principal dispute is whether Plaintiffs satisfy the predominance requirement under Rule 23(b)(3).[90] The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation. *See Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997). To assess predominance, a court must determine whether issues in the class action

---

90 Plaintiffs seek class certification under Fed. R. Civ. P. 23(b)(3) only.

subject to generalized proof predominate over those issues subject to individualized proof. *See Rutstein v. Avis Rent-A-Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000). "Rule 23(b)(3) requires a showing that questions common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen*, 568 U.S. 455, 459 (2013). "Common questions 'predominate' . . . when the substance and quantity of the evidence necessary to prove the class claims w[ill no]t vary significantly from one plaintiff to another." *Tershakovec v. Ford Motor Co., Inc.*, 79 F.4th 1299, 1306 (11th Cir. 2023) (alterations added; citation omitted). In contrast, "[w]here, after adjudication of the classwide issues, plaintiffs must still introduce a great deal of individualized proof or argue a number of individualized legal points to establish . . . the elements of their individual claims, such claims are not suitable for class certification under Rule 23(b)(3)." *Klay v. Humana, Inc.*, 382 F.3d 1241, 1260 (11th Cir. 2004), *abrogated in part on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) (alterations added; citation omitted).

Considering whether "questions of law or fact common to class members predominate" begins with the elements of the underlying cause of action. *Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 809 (2011) [hereinafter *Halliburton I*]. If the elements of the claims are "susceptible to class-wide proof," common issues predominate. *In re Sci.-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1336 (N.D. Ga.

2007). Plaintiffs bring claims under (1) § 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder, against all Defendants; and (2) § 20(a) of the Exchange Act, against Squires, Shaw, and Sanborn.[91] Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance. *See Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1253 (11th Cir. 2014); *Halliburton I*, 563 U.S. at 810.

### A. Applicability of the *Basic* Presumption for Reliance

A plaintiff may show reliance on material misrepresentations in either a direct or indirect fashion. "The traditional (and most direct) way a plaintiff can demonstrate reliance is by showing that he was aware of a company's statement and engaged in a relevant transaction—e.g., purchasing common stock—based on that specific misrepresentation." *Halliburton I*, 563 U.S. at 810. But the Supreme Court "recognized in *Basic* . . . that limiting proof of reliance in such a way 'would place an unnecessarily unrealistic evidentiary burden on the Rule 10b–5 plaintiff who has traded on an impersonal market.'" *Id.* (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 243 (1988)).

Therefore, as the Supreme Court set out in *Basic*, plaintiffs may also establish reliance indirectly using the "fraud-on-the-market theory," which allows for a rebuttable presumption of class-wide reliance on material misrepresentations.

---

91 ECF 82, at 284–98.

*Regions*, 762 F.3d at 1254 (citing *Halliburton I*, 563 U.S. at 811). The fraud-on-the-market theory posits that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *Id.* In other words, it allows courts to presume that an investor relied on public misstatements whenever he or she purchased or sold stock at the price set by the market, because the public misstatement was already baked into the investor's transaction decision. *See In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 668 (N.D. Ga. 2009) (quoting *Basic*, 485 U.S. at 241–42) (describing how, under the fraud-on-the-market theory, "[m]isleading statements will . . . defraud purchasers of stock even if the purchasers do not directly rely on the misstatements").

A plaintiff traveling under a fraud-on-the-market theory is entitled to a rebuttable presumption of reliance if he or she can show that: "(1) the defendant made public material misrepresentations, (2) the defendant's shares were traded in an efficient market, and (3) the plaintiffs traded shares between the time the misrepresentations were made and the time the truth was revealed." *Netbank*, 259 F.R.D. at 668 (quoting *Greenberg v. Crossroads Sys., Inc.*, 364 F.3d 657, 661 (5th Cir. 2004)). Notably, at the class certification stage, plaintiffs need not show proof of materiality, as "materiality is not a common question for purposes of Rule 23(b)(3)." *Amgen*, 568 U.S. at 467–68 ("[T]here is no risk whatever that a failure of

proof on the common question of materiality will result in individual questions predominating.”).

Defendants do not dispute that the *Basic* presumption is applicable; rather, their arguments are focused on rebutting the presumption. Because it is undisputed, the Court notes only briefly that the *Basic* presumption applies here. Defendants made the alleged misstatements in various public settings, such as public earnings calls, press releases, investor conferences, and in testimony before Congress.[92] Norfolk stock was traded in an efficient market, as it was traded on the New York Stock Exchange and experienced average weekly trading of two percent or more of the outstanding shares,[93] both of which are indicia of market efficiency. *See Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 383–84 (N.D. Ga. 2019) (citing *Regions*, 762 F.3d at 1257); *see also Pub. Emps.' Ret. Sys. of Miss. v. Mohawk Indus., Inc.*, 2022 WL 17920570, at *8 (N.D. Ga. Nov. 28, 2022) (citing *Netbank*, 259 F.R.D. at 669) (discussing eight factors courts consider when evaluating market efficiency and noting that each factor need not be met). Lastly, Plaintiffs purchased Norfolk common stock between the time of the misstatements

---

92 *See* ECF 99-1.

93 ECF 235, at 18–20.

and their corrective disclosures.[94] Accordingly, Plaintiffs have established that the *Basic* presumption is applicable.

**B. Rebutting the *Basic* Presumption**

Defendants may rebut the presumption of reliance by "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Netbank*, 259 F.R.D. at 668 (citing *Basic*, 485 U.S. at 248). In addition, "*Halliburton II* held that defendants may rebut the *Basic* presumption at class certification 'by showing . . . that the particular misrepresentation at issue did not affect the stock's market price.'" *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 125 (2021) [hereinafter *Goldman*] (citing *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279–80 (2014) [hereinafter *Halliburton II*]).

In a fraud-on-the-market theory of liability, the misrepresentations either inflate or maintain the overvaluation of the security price until the corrective disclosure pierces the fraudulent bubble and allows the security to assume its "true" price. Because of this interlinking of misrepresentation and disclosure, Plaintiffs must establish predominance through reliance on the front-end misrepresentation as demonstrated by the existence of a back-end corrective disclosure. Where Plaintiffs only allege that misrepresentations maintained the

---

94 *Id.* at 17; *see also* ECFs 24-3, 25-4.

price of a stock—commonly referred to as inflation-maintenance—they do not need to make any showing as to front-end price impact at the time of the misrepresentation because the price impact can be measured solely by the decline in price at the time of the corrective disclosure. *See FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1314 (11th Cir. 2011) (holding that "confirmatory information that wrongfully ***prolongs*** a period of inflation—even without increasing the level of inflation—may be actionable under the securities laws.") (emphasis in original). Plaintiffs nonetheless contend that certain misrepresentations made on January 27, 2021 did not just maintain the price but actually increased and fraudulently inflated the price of the security. To rebut the *Basic* presumption, then, Defendants must show that the misrepresentations had no impact on price—not on the front end when they were made, nor on the back end when their truth was revealed.

### 1. The Front-End Misrepresentations

Plaintiffs identify one day of misrepresentations that purportedly caused a price increase at the time they were made.[95] On January 27, 2021, Norfolk issued a series of statements attributing better-than-expected operating results and profitability to efficiencies achieved through PSR; while discussing these results, the Company twice mentioned the safety of its operations. First, Norfolk

95 ECF 216-1, at 11–13.

published a press release announcing its financial results from the fourth quarter of 2020, which stated:

> "During a year of unprecedented market disruption and uncertainty, the Norfolk Southern team ***delivered record productivity levels while providing safe and reliable freight solutions*** for our customers," said James A. Squires, Norfolk Southern chairman, president and CEO.[96]

Later that same day, Defendants hosted a conference call with investors, in which Sanborn echoed Squires's press-release sentiments regarding safety:

> During the fourth quarter, we saw volumes continue their climb from pandemic induced lows earlier in the year. So the mission of the operating team was ***handling more business while reducing resources and improving productivity.*** Our push for efficiency led to record train weight and record train length in the quarter. These larger trains, combined with our strategy of better matching train size and locomotive horsepower, drove us to record fuel efficiency and enabled us to get the job done with a ***smaller workforce and a record low count of locomotives***. I also have to thank the people that make up our operations team and all crafts. We achieved these records due to their hard work and ***most importantly, we did so safely.***[97]

Norfolk's common stock price increased on January 21 (the same day) by an amount that Plaintiffs' expert (Dr. Matthew Cain) concluded was statistically

---

96 ECF 82, ¶ 408 (emphasis added); ECF 216-4, ¶¶ 11.a, 28.

97 ECF 82, ¶ 409 (emphasis added); ECF 216-4, ¶ 11.a.

significant at greater than a 99 percent confidence level.[98] Plaintiffs argue that this stock increase was due to the misrepresentations made about safety. Defendants counter that safety was not the reason for the price impact and that, rather, Norfolk's common stock increased in price because Norfolk shared positive financial news—namely, its better-than-expected fourth quarter results.[99]

Both arguments can be correct. While true that Norfolk released a plethora of positive financial news on January 21, Defendants' argument ignores that Norfolk's improved financial performance was made possible by the very same PSR cost-reductions that it repeatedly touted as being implemented "safely." Of course, many investors likely responded to reports of improved operational efficiencies that led to higher profits, but it is also reasonable to infer that Norfolk's purported ability to achieve these results while maintaining "safe" operations had some impact on the price increase—otherwise the productivity gains could be washed out by more frequent (and expensive) derailments and other disasters. In any event, this argument over which statements among many interrelated statements truly led to the price increase invites a merits question that is unnecessary for undersigned to resolve. At this class certification stage, the Court

---

98 ECF 216-4, ¶¶ 34–36. Dr. Cain concluded that the stock price increased by 3.48%, or $7.41 per share, after controlling for various other effects. *Id.*

99 ECF 233, at 19.

is concerned only with whether Defendants have severed the link between the alleged misrepresentation and a price impact. Because it is plausible that the price impact could have been caused, at least in part, by Norfolk's alleged misrepresentations that operational efficiencies were achieved safely, the Court concludes that Defendants have not carried their burden in showing a ***lack*** of front-end price impact. *See Allegheny Cnty. Emps.' Ret. Sys. v. Energy Transfer LP*, 623 F. Supp. 3d 470, 493–94 (E.D. Pa. 2022) (concluding that "a more fulsome analysis of the . . . front-end representations is an issue for resolution on the merits" where both true and misleading statements were made during an earnings report).

**2. The Back-End Price Impact**

Apart from the January 27, 2021 statements, Plaintiffs proceed under an inflation maintenance theory, arguing that Defendants' misrepresentations about safety kept share prices artificially high until the East Palestine derailment and other disclosures that followed caused prices to drop to their true value. To rebut the *Basic* presumption as to these misrepresentations, Defendants must sever the link between the back-end price drop and front-end misrepresentations. In assessing this question of price impact, the Supreme Court has instructed courts to "be open to ***all*** probative evidence on that question—qualitative as well as quantitative—aided by a good dose of common sense." *Goldman*, 594 U.S. at 122 (quoting *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 613 n.6 (7th Cir. 2020)). Here,

Defendants attempt to "sever the link" principally by arguing that the alleged misrepresentations were so "generic" that they could not have been "corrected" by specific disclosures and that the alleged disclosures weren't "new" news such that they would have an impact on the price in an efficient market.

### *i.* New Information

Before turning to the alleged misrepresentations, the Court first considers Defendants' argument that Plaintiffs' purported disclosures do not support an inference of price impact, as this could affect which disclosures are viable for the mismatch inquiry. Because the Supreme Court in *Goldman* instructed courts to look to "all probative evidence" for price impact, Defendants argue that this Court should "look to loss-causation case law for guidance" and consider evidence weighing on that question, insisting that other courts have done as much.[100]

Loss-causation is an element of a Rule 10b–5 claim that "requires that the defendant's fraud be both the but-for and proximate cause of the plaintiff's later losses." *FindWhat Inv. Grp.*, 658 F.3d at 1309. Defendants overstate the regularity with which courts use loss-causation analysis to assist in evaluating price impact at the certification stage. Defendants' own briefing identifies only two post-*Goldman* cases that utilized loss-causation precedent for guidance at this stage—

---

100 ECF 233, at 27 (quoting *Jaeger v. Zillow Grp., Inc.*, 2025 WL 2741642, at *1 (9th Cir. Sep. 26, 2025)) (cleaned up).

both are out-of-circuit and unreported, and only one of them concerns allegations of a mismatch between the alleged misrepresentation and the corrective disclosure. *See Jaeger v. Zillow Grp., Inc.*, 2025 WL 2741642, at *1 (9th Cir. Sept. 26, 2025) (finding that the district court did not err by looking to loss-causation caselaw for guidance when assessing a mismatch); *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *12 (N.D. Cal. Mar. 11, 2024) (explaining that back-end price impact requires a showing that the disclosure was corrective, new, and value relevant). In finding that the district court did not err in consulting loss-causation case law for "guidance," the Ninth Circuit nevertheless emphasized that loss causation is a separate inquiry from that of price impact; is reserved for the merits stage; and places the burden on the plaintiff, rather than on the defendant:

> Price impact analysis allows the defendant to rebut the *Basic* presumption at the class certification stage by showing—with the district court as the fact finder—that the "alleged misrepresentation did not actually affect the market price of the stock." . . . Loss causation, on the other hand, is a merits concept similar to proximate cause, which requires the plaintiff to show that the alleged misrepresentations caused the price of the stock the plaintiff purchased to become inflated, and that the inflation caused economic loss when the statements were revealed as false.

*Jaeger*, 2025 WL 2741642, at *1 (citing *Goldman*, 594 U.S. at 119). The Supreme Court has held that securities fraud plaintiffs need not prove loss causation in order to obtain class certification, *Halliburton I*, 563 U.S. at 809, though it later clarified that

its holding in *Haliburton I* did not prohibit defendants from rebutting the *Basic* presumption by introducing direct evidence showing lack of price impact, even if that evidence is the same evidence as defendants would use at a merits stage to disprove loss causation. *Halliburton II*, 573 U.S. at 280–82.

Defendants request that this Court consider a three-factor loss-causation-adjacent test to conclude that the alleged misstatements had no price impact. They ask the Court to consider whether the alleged corrective disclosures were (1) "value relevant," in that they caused at least some of the stock price decline; (2) "new," in that the information disclosed was previously unknown to the market; and (3) "corrective of one or more prior false statements or omissions."[101] Defendants argue that if the corrective disclosures fail on any factor, class certification is improper.[102] The Court sees no need to imbed this merits-stage test into the class certification question, especially considering *Halliburton I*'s instruction that proof of loss causation is not a question for class certification. Instead, following *Halliburton II*'s instruction, the Court will consider the evidence Defendants present on price impact but will not assess whether each disclosure passes Defendants' proposed test.

---

101 ECF 233, at 28 (citing *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *12).

102 *Id.*

Such an approach is consistent with Eleventh Circuit precedent. Prior to *Goldman*, the Eleventh Circuit concluded that, as a matter of law, the "mere repackaging of already-public information" is insufficient to constitute a corrective disclosure. *MacPhee v. MiMedx Grp., Inc.*, 73 F.4th 1220, 1246 (11th Cir. 2023) (quoting *Meyer v. Greene*, 710 F.3d 1189, 1199 (11th Cir. 2013)) (affirming order dismissing a complaint for failure to plead loss causation where the alleged disclosures merely repeated already public information). *MacPhee* and *Meyer* both concerned securities fraud complaints where none of the alleged corrective disclosures contained new information. *Id.* at 1244–49 (finding that a press release, news articles, analyst reports, and the announcement of whistle-blower lawsuits and internal investigations all failed to reveal new information); *Meyer*, 710 F.3d at 1197–1202 (finding that no new information was revealed by the commencement of an SEC investigation or a presentation that stated all information contained therein was "obtained from publicly available sources"). Importantly, in both *MacPhee* and *Meyer*, the plaintiffs failed to identify ***any*** alleged disclosure that contained new information; this, the Eleventh Circuit reasoned, justified finding as a matter of law that the plaintiffs failed to plead loss causation. This principle seems comfortably transferrable to the class certification context: If Defendants can show that ***none*** of Plaintiffs' alleged corrective disclosures revealed new information, then Defendants will have adequately shown the absence of price

impact. Put differently, if Defendants fail to rebut the existence of new information in any alleged corrective disclosure, then they have failed to demonstrate a lack of price impact. The extent to which any particular disclosure affected share price will be reserved for a later, merits stage.

To efficiently consider this question, the Court turns to the last alleged corrective disclosure. The reasons for this are two-fold. First, as mentioned, Plaintiffs are proceeding under an inflation-maintenance theory; as such, they need not show price impact at the time of the misstatement because the inflationary effect of an alleged misstatement can be inferred from a back-end price drop at the time of a corrective disclosure. *See Allegheny Cnty.*, 623 F. Supp. 3d at 491 (noting that inflation-maintenance plaintiffs need not make any showing as to front-end impact because "price impact can be measured solely by the decline in price at the time of the corrective disclosure"). Second, by considering the last alleged corrective disclosure—rather than individually assessing each purported disclosure—the Court can determine whether some amount of price inflation remained for the proposed Class Period. *See MacPhee*, 73 F.4th at 1242 ("[T]he plaintiff need not rely on a single, complete corrective disclosure; rather, it is possible to show that the truth gradually leaked out into the marketplace through a series of partial disclosures.") (internal citations and quotations omitted).

The last day of the proposed Class Period is Friday, March 3, 2023. Plaintiffs allege that the final disclosures occurred over the weekend and on Monday, March 6, the first day the market opened for trading after the close of the Class Period. These disclosures include the March 4 derailment of a Norfolk freight train near Springfield, Ohio; Norfolk's March 6 announcement of a six-point plan to improve operational safety; and contemporaneous media coverage.[103] The safety plan included "adding approximately 200 hot bearing detectors, piloting next-generation hot bearing detectors, reviewing industry practices and alarm thresholds for hot bearing detectors, deploying additional acoustic bearing detectors, accelerating [the Company's] Digital Train Inspection program, and joining the Federal Railroad Administration's Confidential Close Call Reporting System to 'support a strong safety culture.'"[104] Further, CNBC reported on March 6 that internal Norfolk emails showed that the Company "was planning to reduce train length in an effort to prevent future incidents."[105] Dr. Cain's event study

---

[103] ECF 82, ¶¶ 542–544; ECF 216-4, ¶¶ 67–69.

[104] ECF 216-4, ¶ 68.

[105] *Id.* ¶ 67.

found a statistically significant stock price decline on March 6;[106] and notably, Defendants' expert Dr. Glen Hubbard does not dispute this finding.[107]

Nevertheless, Defendants argue that there was no price impact on account of the March 4 and March 6 disclosures because these disclosures did not reveal any new information about Norfolk's safety practices or demonstrate that the alleged misrepresentations were false when made.[108] They argue that none of the derailments that occurred during the Class Period can serve as a corrective disclosure because each reflects "only the materialization of a risk that was well-known to the investing public."[109] While this may be a convincing argument at the merits stage, Defendants are tasked here with refuting price impact entirely. The Court finds that, at a minimum, Defendants have not entirely refuted price impact as to Norfolk's six-point plan and the CNBC reporting that followed. These disclosures provided arguably new information: that Norfolk was acknowledging

---

106 *Id.* ¶¶ 72–73. Dr. Cain's event study used "a regression analysis to measure the relationship between Norfolk Southern's Common Stock price returns and: (i) changes in market-wide factors that would be expected to impact all stocks; and (ii) changes in industry-wide factors that would be expected to impact stocks in Norfolk Southern's industry." *Id.* ¶15. The purpose of this study is to "measure [the] 'abnormal' return [of Norfolk's Common Stock], which represents the component of Norfolk Southern's Common Stock price return that is not attributable to market-wide or industry-wide movements." *Id.*

107 ECF 206-2, ¶ 226.

108 *Id.* ¶¶ 227–38; *see generally* ECF 206, at 30–36.

109 *Id.* at 31.

that its detection systems and train lengths were inadequate to properly minimize risks of derailment—in other words, that, notwithstanding prior assurances, Norfolk's detection systems and train lengths were not sufficiently "safe." Accordingly, Defendants have failed to refute price impact on this ground.

#### *ii.* Generic Misrepresentations

The Court turns next to Defendants' argument that the alleged misrepresentations were too generic to have been corrected by the purported disclosures. The Supreme Court in *Goldman* recognized that "[t]he generic nature of a misrepresentation often will be important evidence of a lack of price impact, particularly in cases proceeding under the inflation-maintenance theory." 594 U.S. at 123. As the Supreme Court explained, the "final inference" necessary to succeed on an inflation-maintenance theory—that "back-end price drop equals front-end inflation"—"starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure," such as when the earlier misrepresentation is "generic" and the corrective disclosure is "specific." *Id.* Still, a mismatch is not conclusive on the absence of price impact. It is only one type of probative evidence, albeit an "important" one, that courts should consider when assessing the issue of price impact. *Id.* at 122–23 (internal citations omitted). Indeed, courts must "be open to ***all*** probative evidence" that weighs on price

impact at class certification, "regardless whether the evidence is also relevant to a merits question like materiality." *Id.* (emphasis in original).

In *Goldman*, the Court ultimately decided that the Second Circuit did not properly consider the generic nature of the alleged misrepresentations at issue, so it remanded the case for the lower court to consider the record evidence. *Id.* at 124. As a result, the Supreme Court provided little by way of example for how lower courts should consider evidence of a specificity mismatch when assessing its effect on price impact. No court in the Eleventh Circuit has been confronted with allegations of a "mismatch." Lacking in-Circuit guidance, Defendants point to a test created by the Second Circuit and followed by various district courts to argue that Plaintiffs' inflation-maintenance theory cannot prevail.

In *Arkansas Teacher Retirement System v. Goldman Sachs Group, Inc.*, 77 F.4th 74 (2d Cir. 2023) [hereinafter *ATRS*], on rehearing after the Supreme Court vacated and remanded *Goldman*, the Second Circuit reviewed the district court's assessment of whether a mismatch in specificity evidenced a lack of price impact in an inflation-maintenance case. As "guidance" for future mismatch cases, it instructed that "a searching price impact analysis must be conducted" where (1) "there is a considerable gap in front-end–back-end genericness," (2) "the corrective disclosure does not directly refer . . . to the alleged misstatement," and (3) the plaintiff claims "that a company's generic risk-disclosure was misleading

by omission." *ATRS*, 77 F.4th at 102. Courts after *Goldman* and *ATRS* have thus concluded that no "searching" analysis is required if any of these conditions is absent. *See Sjunde AP-Fonden v. Goldman Sachs Grp., Inc.*, 798 F. Supp. 3d 416, 443 (S.D.N.Y. 2025); *San Diego Cnty. Emps. Ret. Ass'n v. Johnson & Johnson*, 2025 WL 2176586, at *4 (3d Cir. July 30, 2025). In other words, if a misstatement is not particularly generic, courts are permitted to look less skeptically on market reactions to the disclosures; after all, the inherent concern with inflation-maintenance cases is whether there was artificial inflation in the first place.

Since these cases rely on a series of backward-looking inferences, they are especially susceptible to "litigation-by-hindsight," whereby securities plaintiffs find negative news and then point to any of a company's previous statements that touch upon a similar subject and allege fraud. *ATRS*, 77 F.4th at 101. But a market reaction to negative news is not enough. For a prior statement to be actionable, it must be specific enough that investors would actually rely on it, such that a later, specific disclosure corrects the falsity and dispels artificial inflation. A match in specificity makes it more likely that the market is reacting to a correction, rather than simply reacting to a negative event; conversely, a mismatch calls into question whether the generic statement truly propped up the share price in the first place.

*ATRS* possessed all the criteria demanding a "searching" analysis of price impact: The alleged misrepresentations were generic and did not match the specificity of the corrective disclosures; the corrective disclosures did not directly refer to the alleged misstatements; and the plaintiffs alleged the misstatements were misleading by omission. *Id.* at 82, 101–02. The alleged misrepresentations included generic statements like "[i]ntegrity and honesty are at the heart of our business" and "[w]e have extensive procedures and controls that are designed to identify and address conflicts of interest," whereas the corrective disclosures included a Securities Exchange Commission enforcement action and subsequent news reports revealing that Goldman Sachs had engaged in several allegedly conflicted transactions without disclosure. *Id.* The plaintiffs claimed that Goldman should have divulged details surrounding its management of conflicts with respect to these transactions and that failing to do so was misleading by omission. *Id.* at 101–02.

Finding a mismatch between the generic nature of the misstatements and the specificity of the disclosures, the Second Circuit then conducted its searching analysis of price impact. It reasoned that the next step is to ask, "what would have happened if the company had spoken truthfully at an ***equally generic level***." *ATRS*, 77 F.4th at 99 (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 258 (2d Cir. 2016)) (cleaned up) (emphasis in original). This inquiry is easiest if the company did, in

fact, speak truthfully at a level equally generic to the alleged misrepresentations—in such instances, the court will have actual market reactions to study for price impact. *Id.* at 97–98 (discussing cases with generic truthful substitutes). But where no such generic truthful statement exists, the Second Circuit reasoned that courts could "reimagin[e]" one—that is, consider how the market would hypothetically react to an equally generic truthful statement, had one been made. *Id.* at 97–103. The purpose of this exercise is to consider whether the "defendant's generic ***statements*** on that topic were important," rather than the topic itself. *Id.* at 102–03 (emphasis in the original). The Second Circuit considered that courts could determine whether the statements themselves were important, from a price perspective, by looking to "pre- or post-disclosure discussion in the market regarding a generic front-end misstatement" and "the fact that a truthful, equally generic substitute would likewise not go unnoticed by the market as an inflation dissipator." *Id.*

Ultimately, this analysis goes to the larger task at hand of determining whether the defendants have demonstrated, by a preponderance of the evidence, that the alleged misstatements did not in fact impact the price of the stock.[110] The

---

[110] Defendants point out that this test has been applied in the Eastern District of Michigan, the Southern District of Texas, and the Southern District of New York. Perhaps unsurprisingly, in each of the three cases identified by Defendants, the *ATRS* test resulted in district courts finding that the defendants had rebutted the *Basic* presumption. *Shupe v. Rocket Cos.*, 752 F.

*ATRS* framework is not binding on this Court and, as mentioned, no court in the Eleventh Circuit has yet to evaluate a specificity mismatch at the class certification stage. The Court therefore will look to *ATRS* to the extent it is helpful in responding to the Supreme Court's instruction in *Goldman*: that "***all*** probative evidence" be considered in assessing price impact at class certification. *Id.* (emphasis in the original).

This, of course, begs the question: is there a mismatch in specificity between Norfolk's alleged misrepresentations and the string of disclosures in February and March 2023 that began with the East Palestine derailment? If Norfolk's misrepresentations are not generic, the Court's task of assessing price impact becomes a lot simpler. *ATRS*, 77 F.4th at 82, 101–02. It is important to recognize that an inflation-maintenance theory does not require a "precise match"; rather, "[i]t may frequently be the case that what is ***corrective*** about a 'corrective disclosure' is situated among details which, in the aggregate, make for a somewhat more specific back-end disclosure." *ATRS*, 77 F.4th at 98 (emphasis in original). In the aggregate, the corrective disclosures reveal—at least, according to Plaintiffs'

Supp. 3d 735, 781 (E.D. Mich. 2024) (finding lack of price impact); *In re Concho Res., Inc.*, 2025 WL 1040379, at *12 (S.D. Tex. Apr. 7, 2025) (finding lack of price impact for some but not all of challenged statements); *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *7–*10 (S.D.N.Y. Mar. 29, 2024) (finding lack of price impact).

theory—that Norfolk's strategic PSR operational changes put Norfolk trains at a foreseeably greater risk of derailment with more devastating consequences when a derailment did occur.

### *a.* Company Values Statements

This finally brings us back to the statements at issue and the Court's earlier attempt to categorize them. Turning first to the company values statements, the Court finds that the alleged misrepresentations are inherently generic. They broadly tout Norfolk's focus on safety in the abstract, untethered to any operational programs. Importantly, these statements do not discuss safety in connection with PSR—not explicitly, nor in connection with a particular aspect of PSR. Comparing the company values statements to the string of disclosures, the Court finds a considerable gap in genericness between the earlier statements and the corrective disclosures revealing increased derailment risks due to PSR.

Were the Court to follow the Second Circuit's *ATRS* test, this is where it would ask "whether a truthful—but equally generic—substitute for the alleged misrepresentation would have impacted the stock price." 77 F.4th at 102. The highly generic nature of these statements showcases the limitations of this exercise.

First, who decides what is an "equally generic" substitute? Neither side identifies an actual truthful statement from Norfolk that the Court should treat as

such a substitute. Plaintiffs opt for the hypothetical, arguing that if Defendants had replaced the word "safe" with the word "unsafe" in any of its alleged misrepresentations, the market would have reacted negatively.[111] Defendants, for their part, opt against supplying a substitute at all, arguing that the Court can look to the "news articles, government reports, public disclosures from [Norfolk Southern] and its peers, and analysts' commentary" discussing the operational and safety risks associated with PSR.[112] They contend that, while statements in these materials "may not be 'equally generic' as the challenged statements," they did not correct any purported price inflation.[113]

Defendants' suggestion glazes over the whole mismatch issue, so that won't work. And Plaintiffs' suggestion overly simplifies the analysis. Were courts to replace the operative, subjective word with its converse, surely they would ***always*** be compelled to find that the market would react negatively—at least, for statements as generic as the ones at issue here. Imagine if Norfolk had said "safety is ***not*** a way of life at Norfolk Southern." Or, "safety is ***not*** part of who we are. Safety is ***not*** core to our business and ***not*** essential to achieving operational excellence." Or, undersigned's personal favorite, "we are dedicated to providing

---

111 ECF 236, at 19.

112 ECF 233, at 25–26.

113 *Id.*

employees with an ***unsafe*** workplace and the knowledge and tools they need to work ***unsafely***." If officers at a major publicly traded railroad made statements like these, they would have problems much bigger than this case on their hands.

The problem with Plaintiffs' suggestion is that it is not a ***truthful*** substitute. "Safe" and "unsafe" sound in absolutes. When dealing with an inherently dangerous industry like the freight rail industry, operations can never be entirely "safe." By that same logic, an operating strategy that causes a railroad to take on increased risk cannot all of the sudden transform it into an "unsafe" one; that is because (and undersigned apologizes in advance for the triple negative) it was never not "unsafe" in the first place. Rather, context is what provides meaning to statements about safety. And perhaps this is where the Supreme Court's emphasis on "common sense" comes in. *Goldman*, 594 U.S. at 122. It defies common sense that generalized statements about safety, when expressed merely as company values and untethered to any contextualizing information, would inform investor decisions and therefore inflate Norfolk's stock price. Accordingly, the Court concludes that Defendants have demonstrated, by a preponderance of the evidence, that the company values statements did not actually affect or impact the share price. Defendants have therefore rebutted the *Basic* presumption of reliance as to those statements.

### *b.* Operational Statements

The Court next considers the operational statements. Here, the statements are much more specific. While the operative, misleading word in most of these statements is still the word "safe," they differ from the generic company values statements in that they discuss safety in the context of PSR strategies and results.

For example, they tout increased efficiency metrics—like "handling more business while reducing resources," achieving "consistent operating ratio improvement," or "using assets in the most efficient manner possible"—while in the same breath claiming that Norfolk has made these gains while "operating safely" and "without sacrificing safety."[114] An investor could rely on this information to conclude that Norfolk's adoption of PSR does not compromise its safety record. And such a representation could reasonably inform investor decisions, as analysts have repeatedly discussed Norfolk's safety record compared to that of other Class I railroads, noting often that it "historically runs one of the safest railroads in the U.S."[115] Statements like these do not suffer from a serious mismatch when compared to back-end corrective disclosures that linked PSR to increased safety risks following the East Palestine derailment.[116]

---

[114] ECF 82, ¶¶ 409, 412, 417.

[115] ECF 206-1, ¶¶ 62 & 62 n.129.

[116] ECF 216-4, at 63.

Other operational statements discuss specific metrics of PSR and describe these identifiable changes as being done safely. When asked about Norfolk's increased train length, Sanborn stated that "it's very helpful to us to improve train length"; that "the technology that's brought to us with distributed power capability, makes it a very safe and effective operation"; and that he doesn't see "restrictions on train length" as "necessary."[117] Dr. Cain documented that increasing train lengths was an important metric for analysts during the Class Period, as improvements in this area improved Norfolk's operating ratio.[118] The Court finds a sufficient match between Sanborn's statement claiming that Norfolk was safely increasing train lengths and Norfolk's March 6, 2023 disclosures announcing that it "was planning to reduce train length in an effort to prevent future accidents."[119]

Defendants also made many statements regarding their training program and employee qualifications. They repeatedly emphasized that their shortened training program did not compromise safety. In a March 31, 2021 earnings call, Sanborn stated that Norfolk had reduced its trainmen and engineer training program to a "much shorter period of time" but that "they're still going to be a

---

117 *Id.* at 14–15; ECF 82, ¶ 431.

118 ECF 216-4, at 33–50.

119 *Id.* at 68–69.

very safe employee" because Norfolk was "able to . . . improve the speed to market."[120] Sanborn echoed these remarks in an October 27, 2021 earnings call, stating that Norfolk had "streamlined [its] process of hiring and also [its] training program, taking advantage of technology to do so," but that it was "not going to compromise safety in anything that [Norfolk does] with that regard."[121] Shaw shared a similar message, emphasizing the shortened timeline for training crews and stating that Norfolk is "not going to cut corners on safety" and that it's "really important for [Norfolk]" because it has "to make sure that [its] conductors are well trained as they go out into the field."[122] And emphasizing the "4 or 5 months" it takes to train crews, Shaw stated this is how long it takes to ensure that "those folks . . . become qualified to work productively and safely."[123]

Norfolk regarded its PSR strategies as producing "visible upticks in qualified employees."[124] Sanborn assured members of Congress that Norfolk was vigilant about noticing and changing unsafe practices, especially in regard to employee actions, stating: "If an operating practice is unsafe, we will change it. If an employee acts in an unsafe manner, that will be addressed. If we are bringing

---

120 ECF 82, ¶ 437.

121 *Id.* ¶ 438.

122 *Id.* ¶ 440.

123 *Id.* ¶ 443.

124 *Id.* ¶ 442.

on new employees, we will not rush the process such that they are not properly trained to be able to safely do the work we need them to do."[125] These are the types of statements on which investors rely, taking Defendants at their word that, despite shortening training programs for its crews, Norfolk was able to instill the same qualifications and safety abilities that it had maintained prior to implementing PSR.

The Court finds that these statements sufficiently match disclosures revealing that reduced workforces and understaffed trains—tenets of PSR—contributed to the East Palestine derailment, as indicated, for example, by the February 9, 2023 Yahoo Finance article stating that "[t]o cut costs, the company has slashed jobs by more than a fifth since 2017, ignoring concerns that understaffing could impact railway safety."[126]

Because the operational statements discuss safety in the specific context of certain PSR strategies that were later revealed to have elevated Norfolk's risk, the Court finds that they do not suffer from the kind of mismatch identified in *Goldman* and *ATRS*. And to the extent that there is any gap between these statements and their corresponding disclosures, the Court reiterates that to achieve certification on an inflation-maintenance theory, there need not be a "precise match" between

---

[125] *Id.* ¶ 438.

[126] *Id.* ¶ 520.

the misrepresentations and disclosures. *ATRS*, 77 F.4th at 98; *see generally Sjunde AP-Fonden*, 798 F. Supp. 3d at 437–38 (finding no "serious mismatch" despite acknowledging that "this case does not present an exact match between the alleged misstatement and the corrective disclosure").

### *c.* Mixed Statements

Lastly, as far as alleged mismatches go, the Court considers the mixed statements. As mentioned, these statements fall somewhere in between being obviously generic and sufficiently specific. While they do provide more detail than the company values statements that generally touted safety as being important to Norfolk, they—unlike the operational statements—fail to address aspects of safety in the context of specific attributes of PSR. Consider a few examples.

Speaking on behalf of the Company, Sanborn stated, "We will not be satisfied as long as there is a single injury or accident, which is why we continue our efforts to get better in this area every day."[127] While this statement may improperly suggest that Defendants were working to improve safety while knowing that their PSR strategy was compromising safety levels, it does not provide any tangible information. It does not address how or where Norfolk is working to improve safety; it merely conveys Norfolk's aspirations to be a safe railroad. And the statement, even accepting Plaintiffs' theory of the case, could

---

[127] ECF 82, ¶ 425.

very well be true: perhaps Norfolk is ***not*** satisfied with its safety record, even if its continued dissatisfaction has been caused, at least in part, by other operational decisions it has made.

As undersigned noted when discussing the company values statements, in an inherently dangerous industry like freight rail, to be a "safe" railroad does not mean that the railroad is without risk. Same goes for Sanborn's statement that "all of [Norfolk's] employees, tenured and new alike, are laser-focused on running a safe operation."[128] Again, this statement broadly touts a focus on safety without providing details or metrics to support it. Other statements describing Norfolk as "operating this railroad as efficiently and safely as possible" are also much too generic because they fail to provide any additional, contextualizing information about what the word "safe" means here.[129]

A few of these mixed statements mention an operational or program detail and call it safe but are nonetheless still too generic. Sanborn testified to Congress that "safety extends to hazardous materials too"; without tying how safety extends to hazardous materials, this statement remains too generic to be closely matched to any disclosure.[130] Relatedly, Norfolk's 2020 and 2021 10-K forms filed with the

---

128 *Id.* ¶ 418.

129 *Id.* ¶¶ 407, 418.

130 *Id.* ¶ 429. Further, and as discussed below, none of the alleged disclosures actually deal with Norfolk's handling of hazardous materials. As such, this

SEC state that its "capital spending and replacement programs are and have been designed to assure the ability to provide safe, efficient, and reliable rail transportation services."[131] Like the hazardous materials statement, this statement regarding capital spending, replacement programs, and safety simply provides too little information about what exactly is "safe" about these initiatives to save them from being generic.

Because the parties did not supply an equally generic truthful substitute to these statements—neither actual or hypothetical—the Court relies on "common sense" to conclude that the mixed statements did not inform investor decisions or inflate Norfolk's stock price. Defendants have therefore rebutted the *Basic* presumption of reliance as to those statements.

***iii.* Vent and Burn Statements**

All that remains to be considered are the vent and burn statements. Plaintiffs' claims cannot proceed on these statements for a very basic reason: Plaintiffs have failed to identify any alleged corrective disclosures that correspond to these statements. As Dr. Hubbard explained, "the starting point for evaluating the price impact of any alleged misstatement is the stock price decline following

---

statement suffers a mismatch in the same way that the vent and burn statements do: by failing to have a corresponding disclosure at all.

131 *Id.* ¶¶ 433–34.

an appropriate alleged corrective disclosure."[132] Contrary to the company values or mixed statements, the issue here isn't that the vent and burn statements are generic. They're not. These statements are undeniably specific, as they discuss chemical conditions supposedly occurring in the train cars that derailed in East Palestine and Norfolk's planned response.[133] Plaintiffs assert that Defendants "falsely claimed that the [vent and burn] was necessary to prevent the cars from self-combusting,"[134] but Plaintiffs do not identify a single corrective disclosure made during the Class Period revealing that the vent and burn was, in fact, not necessary.[135] Instead, they argue generally that the February 10, 2023 EPA letter "revealed the direct 'consequence' of the Vent and Burn,"[136] but this argument ignores the fundamental requirements of a fraud-on-the-market claim: Plaintiffs must show that Defendants made a false or misleading statement that affected the stock price and was later corrected. *See MacPhee*, 73 F.4th at 1242 (discussing the requirements for a plaintiff to succeed in a fraud-on-the-market case).

Plaintiffs' insistence that the vent and burn had "consequences" does not show that Defendants misrepresented its necessity. And while Plaintiffs have

---

132 ECF 206-2, ¶ 258.

133 *See* ECF 82, ¶¶ 355, 446, 449–451, 453, 513.

134 *Id.* ¶ 276.

135 ECF 236, at 27.

136 *Id.* at 21.

uncovered evidence in discovery that they believe show the vent and burn may not have been necessary—internal documents, emails, and text messages; deposition testimony conducted during the course of this and related litigation; and at least one investigative report from 2024—none of this evidence was disclosed to the public during the Class Period.[137] Therefore, the vent and burn statements could not have had an impact on share price that was corrected during the Class Period. Again here, Defendants have demonstrated, by a preponderance of the evidence, that the vent and burn statements did not actually affect or impact the share price, thereby rebutting the *Basic* presumption of reliance as to those statements.[138]

**3. Closing Remarks on Price Impact and the Class Period**

Defendants have rebutted the *Basic* resumption of reliance as to the company values statements, mixed statements, and vent and burn statements. They have not done so for the operational statements, and the Court therefore concludes that Plaintiffs are entitled to the *Basic* presumption of reliance as to these

---

137 *Id.* at 12–13, 34.

138 The Court notes that at least one of the vent and burn statements overlaps with alleged corrective disclosures. *See* ECF 82, ¶¶ 446, 513. The Court's determination that the vent and burn statements cannot proceed as misrepresentations does not preclude Plaintiffs from attempting to prove that they served as corrective disclosures. *Cf., MacPhee*, 73 F.4th at 1244–45 (explaining the difficulty of trying to use statements "'both ways, i.e., by characterizing them as both misleading and corrective").

claims. In finding that the operational statements do not present a serious mismatch problem and that at least some alleged corrective disclosures revealed new information, the Court makes no finding as to the merits of Plaintiffs' claims. Defendants may have a strong loss-causation argument when it is Plaintiffs' burden to prove this element of their Rule 10b-5 claims at a later stage. But for now, when the Court is tasked only with answering whether Defendants have "sever[ed] the link between the alleged misrepresentation and either the price received (or paid) by [Plaintiffs], or [their] decision to trade at a fair market price," the Court concludes that Defendants have not. *Goldman*, 594 U.S. at 118 (quoting *Basic*, 485 U.S. at 248).

Defendants alternatively argue that, should the Court certify the Class, the Class Period must be shortened because the class period in a securities class action begins "on the date of the first misstatement," *In re Under Armour Sec. Litig.*, 719 F. Supp. 3d 438, 465 (D. Md. 2024), and ends "when curative information is publicly announced or otherwise effectively disseminated to the market," *In re Sci.-Atlanta, Inc. Sec. Litig.*, 571 F. Supp. 2d 1315, 1344 (N.D. Ga. 2007). The Court agrees, though it notes that where a "substantial question of fact" exists over whether a statement was misleading or cured the market, "the broader time for the class period should be certified." *Id.* at 1344–45 (internal citations omitted).

Plaintiffs' proposed class begins on October 28, 2020 and ends on March 3, 2023.[139] As discussed above, the Court is satisfied that, at a minimum, there are substantial questions of fact over whether the March 4 and 6, 2023 disclosures cured the market; therefore, the last date of the Class Period does not need adjusting. However, the first alleged misrepresentation is one the Court has labeled as a mixed statement: an October 28, 2020 earnings call in which Squires touted Norfolk employees' "dedication to operating this railroad as efficiently and safely as possible while continuing to deliver for our customers during these unprecedented times."[140] The Court has already determined this to be too generic to have any impact on price. As such, October 28 cannot serve as the start date of the Class Period. The next alleged misrepresentations, of which there are two, occurred on January 27, 2021.[141] These statements represented that Norfolk had achieved "record productivity levels," "handl[ed] more business while reducing resources," and employed a "smaller workforce and a record low count of locomotives," while doing so "safely."[142] The Court included these two statements

---

139 ECF 82, ¶ 557.

140 *Id.* ¶ 407; *see also* ECF 99-1.

141 ECF 82, ¶¶ 408, 409.

142 *Id.*

in the actionable operational statements; therefore, the Class Period should begin on January 27, 2021.

## IV. The Remaining Elements of Class Certification under Rule 23(a) and Rule 23(b)(3)

Although the parties' principal dispute is over whether the predominance requirement of Rule 23(b)(3) is met, it is still necessary for the Court to conduct its own inquiry into whether the requirements of Rule 23 have been met. *See Valley Drug Co.*, 350 F.3d at 1188. This includes addressing those requirements that Defendants do not contest.

### A. Ascertainability

Before turning to the enumerated Rule 23(a) requirements, the Court must decide that a proposed class is "adequately defined and clearly ascertainable." *Little v. T-Mobile USA, Inc.*, 691 F.3d 1302, 1304 (11th Cir. 2012) (quoting *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir. 1970)). A class is "clearly ascertainable" if its membership is capable of being determined by "objective criteria." *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1303 (11th Cir. 2021). "The requirement of manageability of ascertaining the class in some ways dovetails with the requirement of manageability of the class action under Rule 23(b)(3)(D)." *Githieya v. Glob. Tel*Link Corp.*, 2020 WL 12948011, at *6 (N.D. Ga. Nov. 30, 2020). Notably, the Eleventh Circuit's ascertainability precedents do not require proof of administrative feasibility. *Cherry*, 986 F.3d at 1303.

Here, the Court finds that the proposed class is adequately defined and clearly ascertainable through objective criteria. The class is limited to investors in Norfolk common stock who acquired these securities during the Class Period, excluding Defendants, directors and officers of Norfolk, and other readily identifiable people.[143] The Court is satisfied that these parameters are administratively manageable and that they will enable counsel and putative class members to easily ascertain whether they are members of the class.

### B. Numerosity under Rule 23(a)

Under Rule 23(a)(1), Plaintiffs must show that the class is so numerous that joinder of all members is impracticable. "[M]ere allegations of numerosity are insufficient to meet this prerequisite, [but] a plaintiff need not show the precise number of members in the class." *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1267 (11th Cir. 2009) (quoting *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 930 (11th Cir. 1983)). While Rule 23(a)(1) imposes a "generally low hurdle," "[a] plaintiff . . .

---

143 *Id.* ¶ 557. Specifically, the Class definition proposed by Plaintiffs is all "persons who purchased or otherwise acquired Norfolk Southern common stock during the Class Period, between October 28, 2020 and March 3, 2023, inclusive." *Id.* Excluded from this definition are "Defendants and their immediate families, directors and officers of Norfolk Southern and their immediate families, and each of the foregoing persons' legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest." *Id.* The Court's various findings in this Order, including the shortening of the class time period, do not alter its conclusion on the ascertainability of the proposed class.

bears the burden of making some showing, affording the district court the means to make a supported factual finding[ ] that the class actually certified meets the numerosity requirement." *Id.* The general rule of thumb in the Eleventh Circuit for meeting the numerosity requirement is that "less than twenty-one is inadequate, more than forty adequate, with numbers between varying according to other factors." *Manno v. Healthcare Revenue Recovery Grp., LLC*, 289 F.R.D. 674, 684 (S.D. Fla. 2013) (quoting *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir. 1986)).

Here, Plaintiffs seek to meet the numerosity requirement based on the number of Norfolk common stock shares outstanding and shares traded during the Class Period.[144] Between October 28, 2020 through March 2, 2023, Norfolk had approximately 227 million shares of common stock outstanding and approximately 6.4 million shares were traded on average each week on the New York Stock Exchange.[145]

As was the case in *Netbank*, the Court notes that "the prerequisite expressed in Rule 23(a)(1) is generally assumed to have been met in class action suits involving nationally traded securities." 259 F.R.D. at 665 (citing *Zeidman v. J. Ray McDermott & Co.*, 651 F.2d 1030, 1039 (5th Cir. 1981) (finding numerosity

144 ECF 235, at 16.

145 *Id.*

established in a case where the company had 46 million shares of common stock outstanding)); *see also In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 274 (N.D. Ala. 2009) (noting that the Court may make a "common sense assumption" that the proposed class meets the numerosity requirement based on the number of shares outstanding). Accordingly, the Court finds that numerosity is satisfied here given the amount and trading volume of Norfolk securities.

**C. Commonality under Rule 23(a)**

Rule 23(a)(2) requires a class proponent to show that there "are questions of law or fact common to the class." The Supreme Court has described the commonality requirement to mean that the plaintiff must "demonstrate that the class members 'have suffered the same injury,'" not merely that they have all suffered a violation of the same provision of law. *Dukes*, 564 U.S. at 349–50 (quoting *Falcon*, 457 U.S. at 157). That common contention "must be of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. As such, the relevant inquiry is better described as "the capacity of a class-wide proceeding to generate common ***answers***," as opposed to common questions. *Id.* (emphasis in original) (citations omitted). "Dissimilarities within the proposed class are what have the potential to impede the generation of common answers." *Id.* (citations omitted). "Generally, where plaintiffs allege that

the action is a result of a unified scheme to defraud investors, the element of commonality is met." *Monroe*, 332 F.R.D. at 378 (citing *Netbank*, 259 F.R.D. at 664).

Plaintiffs argue that there are "numerous common questions of law or fact, including whether: (i) Defendants made false or misleading statements; (ii) Defendants' misstatements were material; (iii) Defendants acted with scienter; (iv) Norfolk's common stock price was artificially inflated during the Class Period; and (v) Defendants' misstatements caused Class members' economic losses."[146] The Court finds that these questions raise common contentions, and the determination of their truth or falsity will resolve issues central to the validity of all class members' claims. Accordingly, the commonality requirement is met.

**D. Typicality under Rule 23(a)**

Now, to the first disputed Rule 23(a) requirement: typicality. This requirement seeks to ensure that a representative plaintiff "possess[es] the same interest and [has] suffer[ed] the same injury shared by all members of the class he represents." *Netbank*, 259 F.R.D. at 665 (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 216 (1974)). It requires "a nexus between the class representative's claims or defenses and the common questions of fact or law which unite the class." *Id.*

[146] *Id.* at 17.

Like commonality, the test for typicality is not demanding. *See In re Checking Account Overdraft Litig.*, 286 F.R.D. 645, 653 (S.D. Fla. 2012). Often, "the commonality and typicality requirements of Rule 23(a) tend to merge." *Dukes*, 564 U.S. at 349 n.5 (cleaned up) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157–158, 157 n.13 (1982)). Provided "the claims or defenses of the class and the class representative[s] arise from the same event or pattern or practice and are based on the same legal theory," the nexus is sufficient. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984) (alteration added).

Further, the class representatives' factual situations need not be identical; "factual variation will not render a class representative's claim atypical unless the factual position of the representative markedly differs from that of other members of the class." *Id.* (citations omitted). Indeed, "when there is a strong similarity of legal theories," "[t]he typicality requirement may be satisfied despite substantial factual differences." *Regions*, 762 F.3d at 1259 (quoting *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1357 (11th Cir. 2009)).

Likewise, stronger or unique defenses against class representatives do not necessarily create typicality issues. That a defendant "ha[s] a stronger defense against [some representatives] does not render the [representatives] atypical." *Kornberg*, 741 F.2d at 1337 (alterations added). And the presence of a unique defense against a representative does not render that representative atypical

"***unless*** that defense threatens to become the focus of litigation thereby prejudicing the absent class members." *In re Jan. 2021 Short Squeeze Trading Litig.*, 2023 WL 9035671, at *11 (S.D. Fla. Nov. 13, 2023) (emphasis in original) (citing *Swack v. Credit Suisse First Bos.*, 230 F.R.D. 250, 264 (D. Mass. 2005) (collecting cases)). A unique defense will only preclude a finding of typicality if it places the class's interests in "significant jeopardy." *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 326 (S.D. Fla. 1996) (quotation marks and citation omitted).

Defendants make two arguments for why Plaintiffs fail the typicality requirement, both premised on the timing of when Plaintiffs last purchased Norfolk stock, which—for all named Plaintiffs—was in 2022, prior to the East Palestine Derailment.[147] First, they assert that Plaintiffs lack standing to assert a Rule 10b-5 claim premised on the vent and burn statements because these statements occurred after Plaintiffs purchased Norfolk shares. This argument is mooted by the Court's ruling that the vent and burn statements are not

---

[147] ECF 24-3, at 4 (Akademiker); ECF 25-4, at 3 (Ironworkers).

actionable.[148] Second, Defendants assert that putative class members who purchased after the derailment are subject to different defenses than Plaintiffs.[149]

Specifically, Defendants argue that putative class members who purchased Norfolk's stock after the East Palestine derailment had significantly different information about Norfolk's safety practices. This argument ignores Plaintiffs' theory of the case: Plaintiffs allege that relevant truths about Norfolk's safety practices were gradually revealed beginning with the East Palestine derailment but that the full extent of Defendants' disregard for safety did not come to light until the close of the Class Period.[150] As referenced earlier, "it is possible to show that the truth gradually leaked out into the marketplace 'through a series of partial disclosures.'" *Meyer*, 710 F.3d at 1197 (internal citations omitted). What matters is whether the "injury Plaintiffs suffered is alleged to be the same as the injury suffered by all members of the putative Class." *Monroe*, 332 F.R.D. at 379.

Should Plaintiffs prove that the true extent of Defendants' disregard for safety was not revealed until the close of the Class Period, the putative class

---

148 The last alleged misrepresentation that the Court considers actionable is from August 17, 2022. *See* ECF 82, at 443; ECF 99-1. Both named Plaintiffs purchased Norfolk common stock after those dates. *See* ECF 24-3, at 4 (Akademiker); ECF 25-4, at 3 (Ironworkers).

149 ECF 233, at 42–47.

150 ECF 82, ¶ 510.

members who purchased after the East Palestine derailment would have suffered the same injury as Plaintiffs: purchasing Norfolk common stock at an artificially inflated price. That they did so after Defendants' misrepresentations were partially corrected does not create typicality problems because "[r]eliance on the integrity of the market prior to disclosure of alleged fraud (i.e. during the class period) is unlikely to be defeated by post-disclosure reliance on the integrity of the market." *Regions*, 762 F.3d at 1260 (quoting *Feder v. Elec. Data Sys. Corp.*, 429 F.3d 125, 138 (5th Cir. 2005)). Accordingly, the typicality requirement is met here.

**E. Adequacy under Rule 23(a)**

Defendants' final attack on the representatives' qualifications under Rule 23(a) focuses on their adequacy. Rule 23(a) requires that the court ensure that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement "encompasses two separate inquiries: (1) whether any substantial conflicts of interest exist between the representatives and the class; and (2) whether the representatives will adequately prosecute the action." *Luczak v. Nat'l Beverage Corp.*, 548 F. Supp. 3d 1256, 1268 (S.D. Fla. 2021) (quoting *Busby v. JRHBW Realty, Inc.*, 513 F.3d 1314, 1323 (11th Cir. 2008)). "Although the elements of typicality and adequacy trigger distinct inquiries, the

typicality and adequacy analyses under Rule 23(a) tend to merge." *Id.* (internal citations and alterations omitted).

Defendants' adequacy argument dovetails with their typicality argument. They argue that Plaintiffs' "interests are not aligned with proposed class members who purchased Norfolk Southern stock after derailment" and that Plaintiffs "have little incentive to pursue separate legal theories premised on the vent-and-burn statements."[151] This argument is not persuasive. First, the Court has already concluded that the vent and burn statements are not actionable. And second, the Court sees no reason why Plaintiffs would not provide adequate representation for class members who purchased after the East Palestine derailment; as discussed above, under Plaintiffs' theory, all class members suffered the same injury. The Court therefore concludes that Plaintiffs have met the adequacy requirement.

**F. Superiority under Rule 23(b)(3)**

Finally, Rule 23(b)(3) requires that the Court find that the class action is superior to other available methods of adjudication. "[T]he focus of this analysis is on the relative advantages of a class action suit over whatever other forms of litigation might be realistically available to the plaintiffs." *City of Sunrise Gen. Emps.' Ret. Plan v. FleetCor Techs., Inc.*, 2019 WL 3449671, at *7 (N.D. Ga. July 17, 2019) (quoting *Sacred Heart Health Sys., Inc. v. Humana Mil. Healthcare Servs., Inc.*,

---

[151] ECF 206, at 42, 44 n.11.

601 F.3d 1159, 1183–84 (11th Cir. 2010)). "As a general rule, class action treatment presents a superior method for the fair and efficient resolution of securities fraud cases." *Netbank*, 259 F.R.D. at 676; *see also In re Recoton Corp. Sec. Litig.*, 248 F.R.D. 606, 619 (M.D. Fla. 2006) ("The case law is clear that class actions are 'a particularly appropriate means for resolving securities fraud actions.'") (quoting *In re AmeriFirst Sec. Litig.*, 139 F.R.D. 423, 427 (S.D. Fla. 1991)).

Here, Defendants have not argued that Plaintiffs fail to meet the superiority prong under Rule 23(b)(3), and the Court finds that it is met here. Moreover, as in *FleetCor*, "the Court's finding that common issues predominate cuts strongly in favor of certifying the class." 2019 WL 3449671, at *7 (citing *Sacred Heart*, 601 F.3d at 1184 ("[T]he predominance analysis has a tremendous impact on the superiority analysis for the simple reason that, the more common issues predominate over individual issues, the more desirable a class action lawsuit will be as a vehicle for adjudicating the plaintiff['s] claims.")). Additionally, it is desirable to concentrate the litigation in this forum, where Norfolk is principally located.[152]

The Court finds no particular difficulties in managing this class action. Having found that Plaintiffs have met the Rule 23(a) and Rule 23(b)(3)

---

[152] ECF 82, ¶ 31.

requirements for class certification of the present action, the Court hereby **GRANTS** Plaintiffs' motion for class certification.

### G. Appointment of Class Counsel under Rule 23(g)

As discussed in the Rule 23(a)(4) analysis above, after considering the requirements of Rule 23(g), the Court finds that Kessler Topaz Meltzer & Check, LLP (KTMC) and Robbins Geller Rudman & Dowd LLP (RGRD) as Class Counsel, and Caplan Cobb LLC and Herman Jones LLP as Co-Liaison Counsel, will be able to fairly and adequately represent the class, and therefore finds it appropriate to appoint KTMC and RGRD as Class Counsel and Caplan Cobb and Herman Jones as Co-Liaison Counsel.

## V. Conclusion

The Court **GRANTS** Plaintiffs' Motion for Class Certification [ECF 185] and certifies the following Class:

> All persons and entities that purchased or otherwise acquired Norfolk Southern common stock from January 27, 2021 through March 3, 2023, inclusive. Excluded from the Class are: (i) Defendants; (ii) any current or former officers or directors of Norfolk; (iii) the immediate family members of any Defendant or any current or former officer or director of Norfolk; (iv) any entity that any Defendant owns or controls, or owned or controlled during the Class Period; (v) any affiliates, parents, or subsidiaries of Norfolk; and (vi) the legal representatives, heirs, successors, and assigns of any such excluded persons.

Lastly, the Court appoints Plaintiffs as Class Representatives, Kessler Topaz Meltzer & Check, LLP and Robbins Geller Rudman & Dowd LLP as Class Counsel, and Caplan Cobb LLC and Herman Jones LLP as Co-Liaison Counsel.

Within 30 days of this Order, the parties are **ORDERED** to file a proposed notice to all putative class members pursuant to Rule 23(c)(2)(B). To the extent the parties are unable to reach a consensus on the proposed notice or the mechanics surrounding it, they may utilize the discovery dispute procedure set forth in undersigned's standing order.

Further, in consideration of the request made by counsel during oral argument on the instant motion, the deadline for dispositive motions is hereby extended through and including **December 1, 2026**.

The Clerk of Court is **DIRECTED** to submit this Order to undersigned after 30 days.

**SO ORDERED** this 29th day of September, 2026.

Steven D. Grimberg
United States District Judge

## CERTIFICATE OF SERVICE

I hereby certify that on October 13, 2026, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system.

I further certify that I have mailed the foregoing document by Federal Express, postage prepaid, for delivery within 3 calendar days, to the following:

NATHAN A. HASIUK
DANIEL A. FRIEDMAN
VANESSA M. MILAN
ALEC S. GARBER
KESSLER TOPAZ
MELTZER & CHECK, LLP
280 King of Prussia Road
Radnor, PA 19087

MICHAEL A. CAPLAN
CAMERON B. ROBERTS
ANNIE BORING
CAPLAN COBB LLC
75 Fourteenth Street, NE,
Suite 2700
Atlanta, GA 30309

JASON C. DAVIS
ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street,
Suite 1800
San Francisco, CA 94104

ASHLEY M. PRICE
PETER KO
MARK CONOVER
JACK ABBEY GEPHART
ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Ste. 1900
San Diego, CA 92101

JOHN C. HERMAN
HERMAN JONES LLP
3424 Peachtree Road NE,
Suite 1650
Atlanta, GA 30326

JOSEPH F. MURRAY
MURRAY MURPHY MOUL
+ BASIL LLP
1114 Dublin Road
Columbus, OH 43215

Date: October 13, 2026

*/s/ Michael G. Bongiorno*
Michael G. Bongiorno